Melinda D. Nokes (CA Bar #167787)
Paul J. Pennock, Esq.
**WEITZ & LUXENBERG, P.C.**
1800 Century Park East, #700
Los Angeles, CA 90067
Phone: (310) 247-0921
Facsimile: (310) 786-9927
mnokes@weitzlux.com
ppennock@weitzlux.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE FISHER; STEVE GIROUX; CLOYD HOLMES JR; GERMAINE JANRHETT; MAVIO BARTON; RON GILBERT; HOWARD RASHKOW; DIANA SHARP; SAMUEL KWAKU AGYEI FOSU GODMAN; RICHARD BENNETT; DANNY BRAKE; RAYMOND CHISM; KATRINA CORLIS; JAMES CORUM; KAREN FARQUHARSON; SANDY FIKE; NORMA FUENTES; MARY HEIGHT; DIONNE HENDERSON; PAULA IIDA; SIMON JIMENEZ; LEONARD KRALL; DAVID CHARLES LASBY; SANDRA LENT; VIRGINIA LEYVA; BETTYJO LONG; ROBERT LOPEZ; TONY LOPEZ; MARK LYNCH; BECKY MANNING; RICHARD MCCLAIN; CANDELARIO MENDOZA; JEFFREY MONTGOMERY; ALLISON MUPAS; BERNADETTE NEREY; MARY PAGE; LINDA PALAFOX; SANDRA PARKER; MARIELA PEREZ; IRLINE QUICK; DOROTHY RAKESTRAW; BRENT RIOS; JORGE RUIZ; SUMMER STALEY-BACHA; GREGORY VANCE; MARTIN VILLA; BARBARA WATKINS; DARLENE WATSON; KATHLYN WILKERSON; MICHAEL WOOTEN; REBECCA D CARTER; PHYLLIS HELM; AMALIA NETTO; LAWRENCE RODICK; LINDA RUFFIN; ELAINE SCOTT; PENNY WOLFE; GERALDINE ALSTON; SONJA ANTHONY; MONIQUE BELL; ANTWONE BLUE; | COMPLAINT FOR DAMAGES<br><br>AND DEMAND FOR JURY TRIAL<br><br>1. NEGLIGENCE<br>2. STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT<br>3. STRICT PRODUCT LIABILITY—DESIGN DEFECT<br>4. STRICT PRODUCTS LIABILITY—FAILURE TO WARN<br>5. MISREPRESENTATION<br>6. BREACH OF IMPLIED WARRANTY<br>7. WRONGFUL DEATH<br>8. LOSS OF CONSORTIUM<br>9. SURVIVAL ACTION |

MARGUERITE BOGAR; MICHAEL )
BROOKS; ROCHELLE BROWN; )
ANTHONYEA CASTELLI; DOLORES )
CHAPA; SHEILA CLAYTON; ROBERT )
DAVIS; RONNIE DOMINGOS; BEVERLY )
FOSTER; FRED FRANKLIN; MARIA )
GABRIEL; MICHELLE GARRETT; )
STEPHEN GRAHAM; KAREN JACKSON; )
BEVERLY JULIEN; ALBERT KADOSH; )
SHANNEL LANGRAM; DIANA L LANIER; )
ALEKSANDR MALYKIN; RICHARD )
MANOS; STANLEY MILLER; NANCY )
NEWMAN; FRANCES ORTIZ; DONALD )
PERKINS; VAREE ROYSTON; SHAHANZ )
SHADROOZ; MICHAEL THOMPSON; )
ELAINE TURNER; LESSIE WRAGGS, )
         Plaintiffs, )
          )
   v. )
          )
ABBOTT LABORATORIES,
ASTRAZENECA PHARMACEUTICALS LP,
ASTRAZENECA LP, GLAXOSMITHKLINE
CONSUMER HEALTHCARE HOLDINGS
(US) LLC, GLAXOSMITHKLINE
CONSUMER HEALTHCARE LP ,
GLAXOSMITHKLINE CONSUMER
HEALTHCARE HOLDINGS (US) IP LLC,
MERCK & CO. INC. D/B/A MERCK,
SHARP & DOHME CORPORATION,
NOVARTIS CORPORATION, NOVARTIS
PHARMACEUTICAL CORPORATION,
NOVARTIS VACCINES AND
DIAGNOSTICS, INC., NOVARTIS
INSTITUTES FOR BIOMEDICAL
RESEARCH, INC., NOVARTIS CONSUMER
HEALTH, INC., PFIZER, INC., THE
PROCTER & GAMBLE COMPANY,
PROCTER & GAMBLE MANUFACTURING
COMPANY, TAKEDA
PHARMACEUTICALS USA, INC., TAKEDA
PHARMACEUTICALS AMERICA, INC. ,
TAKEDA PHARMACEUTICALS LLC,
TAKEDA PHARMACEUTICALS
INTERNATIONAL, INC., TAKEDA
DEVELOPMENT CENTER AMERICAS,
INC. F/K/A TAKEDA GLOBAL RESEARCH
& DEVELOPMENT CENTER, INC.,
TAKEDA PHARMACEUTICAL COMPANY
LIMITED, TAP PHARMACEUTICAL
PRODUCTS, INC. F/K/A TAP HOLDINGS
INC., WYETH PHARMACEUTICALS, INC.,

WYETH-AYERST LABORATORIES,
WYETH LLC

          Defendants.

_____

       COME NOW, Plaintiffs, by and through the undersigned counsel, and bring this Complaint against the above named defendants (collectively, "Defendants"), and further allege, upon information and belief, except that information based upon personal knowledge, as follows:

## I.    <u>INTRODUCTION</u>

       1.     This is an action for damages by all named Plaintiffs arising from Plaintiffs' use of one or more of pharmaceutical drugs belonging to the class of drugs known as proton-pump inhibitors (hereinafter, "PPIs" or "PPI Products"), which resulted in injuries and damages.

       2.     As used herein, the term "PPIs" includes, but is not limited to Prilosec, Prilosec OTC, Nexium, Nexium 24HR, Prevacid, Prevacid 24HR, Protonix, and Dexilant.

       3.     PPIs are used to suppress the production of acid in order to reduce the risk of duodenal ulcer recurrence and NSAID-associated gastric ulcers, as well as to treat gastroesophageal reflux disease ("GERD") and certain pathological hypersecretory conditions, including Zollinger-Ellison syndrome.

       4.     The Defendants in this action designed, developed, tested, manufactured, packaged, labeled, advertised, promoted, marketed, distributed and sold PPIs to consumers, including Plaintiffs, resulting in Plaintiffs' injuries.

       5.     PPIs can cause extremely serious and dangerous kidney injuries, including acute kidney injury (AKI), acute interstitial nephritis (AIN), chronic kidney disease (CKD), and end-stage renal disease (ESRD), which is also known as "renal failure" or "kidney failure," as well as

life-threatening complications thereof and even death.   Hereinafter, any of the foregoing conditions–AKI, AIN, CKD, and ESRD–may, at times, be referred to as a "kidney injury," and all may collectively be referred to as "kidney injuries."

6.    As a direct and proximate consequence of using PPIs that Defendants manufactured, sold or otherwise placed into the stream of commerce, each Plaintiff named herein suffered a suffered one or more kidney injuries and resulting damages.

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to each Plaintiff exceeds $75,000.00, exclusive of interests and costs, and because complete diversity exists between the parties, as set forth below, in that no Defendants is incorporated and has its principal place of business in a states in which each Plaintiff resides and of which each Plaintiff is a citizen and domiciliary.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred, in part, in the Central District of California.

## III.    DEFENDANT PARTIES

9.    Defendant Abbott Laboratories ("Defendant Abbott") is and, at all times relevant to this action, has been an Illinois Corporation having a principal place of business at 100 Abbott Park Rd., Abbott Park, Ill. 60064.

10.    In and around 1977, Defendant Abbott and Defendant Takeda Pharmaceutical Company Limited entered into a joint venture resulting in the creation of TAP Holdings, Inc.

11.     As a part of their business and at all relevant times, Defendant Abbott has been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of prescription Prevacid (lansoprazole) products.

12.     Defendant Abbott manufactures and markets Prevacid throughout the United States, including within the State of California where Plaintiffs at all relevant times resided and were citizens.

13.     Defendant Abbott has transacted and conducted business related to Prevacid in in California and throughout the United States.

14.     Defendant Abbott has derived substantial revenue from Prevacid in each of the States and Territories of the United States.

15.     Defendant Abbott has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid.

16.     Defendant AstraZeneca Pharmaceuticals LP is and, at all times relevant to this action, has been a Delaware limited partnership having a principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

17.     Defendant AstraZeneca PLC is and, at all times relevant to this action, has been a Delaware Corporation with its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

18.     Defendant AstraZeneca Pharmaceuticals LP is and, at all times relevant to this action, has been a wholly owned subsidiary of Defendant AstraZeneca PLC and is comprised of four partners, Defendant AstraZeneca AB, Defendant Zeneca Inc., Defendant Astra US Holdings Corporation and Astra USA LLC.

19.     Defendant AstraZeneca AB, the general partner comprising Defendant AstraZeneca Pharmaceuticals LP, is a Swedish corporation having a principal place of business at SE-151 36 Sodentalje, Sweden.

20.     Defendant Zeneca Inc., one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a Delaware Corporation having its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

21.     Defendant Astra US Holding Corporation, one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a Delaware Corporation having its principal place at 1800 Concord Pike, Wilmington, DE 19850.

22.     Defendant Astra U.S.A. LLC, one of the three limited partners comprising Defendant AstraZeneca Pharmaceuticals LP, is and, at all times relevant to this action, has been a New York Corporation having its principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

23.     Defendant AstraZeneca LP is and, at all times relevant to this action, has been a Delaware limited partnership having a principal place of business at 1800 Concord Pike, Wilmington, DE 19850. Defendant AstraZeneca LP is and, at all times relevant to this action, has been a wholly owned subsidiary of AstraZeneca PLC.

24.     Defendant AstraZeneca LP is comprised of two partners. Defendant AstraZeneca Pharmaceuticals LP is the general partner and Defendant KBI Sub, Inc. is the limited partner.

25.     Defendant KBI Sub, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 1 Merck Drive, White House Station, NJ 08889.

26.    Defendant AstraZeneca Pharmaceuticals LP, Defendant AstraZeneca PLC, Defendant AstraZeneca AB, Defendant Zeneca Inc., Defendant Astra US Holding Corporation, Defendant Astra U.S.A. LLC, Defendant AstraZeneca LP and Defendant KBI Sub, Inc. are referred to collectively herein as the "AstraZeneca Defendants."

27.    Each of the AstraZeneca Defendants was the agent and employee of the other AstraZeneca Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other AstraZeneca Defendants' actual and implied permission, consent, authorization and approval.

28.    The AstraZeneca Defendants, in collaboration amongst themselves, designed, tested, researched and developed the prescription and non-prescription over-the-counter Prilosec (omeprazole) and Nexium (esomeprazole) products.

29.    As a part of their business and at all relevant times, the AstraZeneca Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of both prescription and over-the-counter Prilosec and Nexium products.

30.    In 1982, the AstraZeneca Defendants entered a joint venture with Defendant Merck to design and develop the first proton pump inhibitor.

31.    The result of this joint-venture was the development of omeprazole, which was ultimately marketed and sold under the brand name Prilosec.

32.    In September 1989, the FDA approved Prilosec for healing of erosive esophagitis, maintenance of healing erosive esophagitis and treatment of GERD.

33.    The AstraZeneca Defendants hold and have held the patent for the drug Prilosec which, by the year 2000, was the most widely prescribed drug in the world.

34.    In an agreement reached in 1997, the AstraZeneca Defendants licensed to the Procter & Gamble Defendants the exclusive rights to market the over-the-counter version of Prilosec, known as Prilosec OTC, which was launched in September 2003.

35.    According to the agreement between the Procter & Gamble Defendants and the AstraZeneca Defendants, the AstraZeneca Defendants supply Prilosec OTC and the Procter & Gamble Defendants market and sell Prilosec OTC.

36.    In 2006, the FDA approved New Drug Application ("NDA") 22056 to allow the AstraZeneca Defendants the right to market and sell prescription Prilosec to children aged two and younger for the treatment of GERD.

37.    Defendant AstraZeneca Pharmaceuticals LP is the holder of approved NDA 019810 for Prilosec Delayed-Release Capsule Pellets and 022056 for Prilosec Delayed-Release Oral Suspension.

38.    Defendant AstraZeneca LP is the holder of NDAs 019810/S-1 – S-102 for Prilosec Delayed Release Capsules, 022056/S-1-S-019 for Prilosec delayed release oral suspension and 021229/S-1-S-029 for Prilosec OTC delayed release tablets.

39.    The AstraZeneca Defendants manufacture and market each of these Prilosec formulations in the United States.

40.    In anticipation of the expiration of the patent for prescription Prilosec, the AstraZeneca Defendants launched an internal program called Operation Shark Fin for the purpose of developing a second PPI Product in order to capitalize on the market for PPI Products. The result of Operation Shark Fin was the development of Nexium (esomeprazole).

41.    In December 1999, Defendant AstraZeneca Pharmaceutical LP submitted its first NDA for a Nexium product, NDA 021153, to the FDA for approval to market Nexium in the United States.

42.     In December 2000, the FDA simultaneously approved Nexium, NDA 021153, and Nexium Delayed Release, NDA 021154, for healing of erosive esophagitis, maintenance of healing erosive esophagitis, treatment of symptomatic GERD and H. pylori eradication to reduce the risk of duodenal ulcer recurrence (as part of a triple therapy with amoxicillin and clarithromycin).

43.     Defendant AstraZeneca Pharmaceuticals LP is also the holder of approved NDAs 021957 and 022010 for Nexium Delayed-Release Oral Suspension, and NDAs 022101 and 021689 for Nexium Injection Solution.

44.     The AstraZeneca Defendants manufacture and market each of the aforementioned Nexium formulations in the United States.

45.     In 2003, the AstraZeneca Defendants spent $260 million alone in promoting and marketing Nexium products to American consumers, the largest amount spent on marketing a single brand of pharmaceutical to that date.

46.     In an agreement reached in 2012, the AstraZeneca Defendants licensed to the Pfizer Defendants the exclusive right to market an over-the-counter version of Nexium, known as Nexium 24HR, which was launched in 2014.

47.     According to the agreement between the Pfizer Defendants and the AstraZeneca Defendants, the AstraZeneca Defendants receive royalty payments from the Pfizer Defendants on product launches and sales.

48.     The AstraZeneca Defendants have transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

49.     The AstraZeneca Defendants have derived substantial revenue from PPI Products used in each of the States and Territories of the United States. For example, in 2003 alone, sales of Nexium in the United States was $2.7 billion and world-wide was $3.9 billion.

50.     The AstraZeneca Defendants have expected or should have expected their acts to have consequences within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPIs.

51.     Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 184 Liberty Corner Road, Warren, NJ 07059.

52.     Defendant GlaxoSmithKline Consumer Healthcare LP is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 184 Liberty Corner Road, Warren, NJ 07059.

53.     Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) IP LLC is and, at all times relevant to this action, has been a Delaware limited liability corporation having a principal place of business at 5 Crescent Drive, Philadelphia, PA 19112.

54.     Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Defendant GlaxoSmithKline Consumer Healthcare LP and Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) IP LLC are referred to collectively herein as the "GlaxoSmithKline Defendants."

55.     Each of the GlaxoSmithKline Defendants was the agent and employee of the other GlaxoSmithKline Defendants and in doing the things alleged, was acting within the course and scope of such agency and employment and with the other GlaxoSmithKline Defendants' actual and implied permission, consent, authorization and approval.

56.     The GlaxoSmithKline Defendants, pursuant to an agreement with the Novartis Defendants, obtained the rights to market and sell the over-the-counter medication Prevacid 24Hr.

57.    The GlaxoSmithKline Defendants, in collaboration and amongst themselves, designed and developed Prevacid 24HR.

58.    As a part of their business and at all relevant times, the GlaxoSmithKline Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Prevacid 24HR products.

59.    Defendant GlaxoSmithKline Consumer Healthcare (US) IP LLC is the holder of approved NDA 022327 for Prevacid 24HR.

60.    The GlaxoSmithKline Defendants manufacture and market Prevacid 24HR in the United States.

61.    The GlaxoSmithKline Defendants have transacted and conducted business related to Prevacid 24HR in each of the States and Territories of the United States.

62.    The GlaxoSmithKline Defendants have derived substantial revenue from Prevacid 24HR in each of the States and Territories of the United States.

63.    The GlaxoSmithKline Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid 24HR.

64.    Defendant Merck & Co. Inc. d/b/a Merck, Sharp & Dohme Corporation (hereinafter "Defendant Merck") is and, all times relevant to this action, has been a New Jersey corporation having a principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

65.    In 1982, Defendant Merck entered into an agreement with the AstraZeneca Defendants, under the terms of which Defendant Merck developed and marketed the AstraZeneca Defendants' products, including Nexium and Prilosec products, under a royalty-bearing license.

66.     In 1993, Merck's total sales of the AstraZeneca Defendants' products reached a level that triggered the first step in the establishment of a joint venture business (the "Joint Venture") in which Defendant Merck and the AstraZeneca Defendants each owned a 50% share. This Joint Venture, formed in 1994, was called Astra Merck Inc. and was responsible for the sale of Prilosec and other of the AstraZeneca Defendants' products.

67.     In 1997, the Procter & Gamble Defendants formed a strategic alliance with the Joint Venture to develop and market Prilosec OTC.

68.     Until 2014, Defendant Merck had a contractual and ownership interest in the Joint Venture. Through these interests, between 2009 and 2014, Defendant Merck earned at least $7 billion, based on the sales of prescription and over-the-counter formulations of Nexium and Prilosec.

69.     Defendant Merck currently has, and will continue to have until 2018, a financial interest in prescription and over-the-counter formulations of Nexium and Prilosec.

70.     As a part of their business and at all relevant times, Defendant Merck has been and is involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of prescription and over-the-counter formulations of Prilosec and Nexium.

71.     In 1989, Defendant Merck sponsored the first NDA for a Prilosec product, NDA 019810, which it submitted to the FDA for approval to market Prilosec. Under this NDA the following forms of Prilosec have been approved: Delayed-Release Capsule Pellets (20mg), approved on September 14, 1989; Delayed-Release Capsule Pellets (10mg), approved on October 5, 1995; and Delayed-Release Capsule Pellets (40mg) approved on January 15, 1998.

72.     Defendant Merck has also had a contractual, ownership and financial interest in Prilosec Delayed-Release Oral Suspension, NDA 022056.

73.     Defendant Merck, through the Joint Venture, also designed, researched, manufactured, tested, advertised, marketed, sold and distributed Nexium.

74.     Defendant Merck has had a contractual, ownership and financial interest in the following FDA approved forms of Nexium: Delayed-Release Capsule Pellets, NDA 021153; Delayed Release Oral Suspension, NDAs 02195 and 022010; and Intravenous Injectable Solution, NDA 021689.

75.     Defendant Merck manufactures and markets Nexium products in the United States.

76.     Defendant Merck manufactures and markets Prilosec products in the United States.

77.     Defendant Merck has transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

78.     Defendant Merck has derived substantial revenue from PPI Products in each of the States and Territories of the United States.

79.     Defendant Merck has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

80.     Defendant Novartis Corporation is and, at all times relevant to this action, has been a Swiss corporation having a principal place of business at Lichtstrasse 35, CH-4056 Basel, Switzerland.

81.     Defendant Novartis Pharmaceutical Corporation is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at One Health Plaza, East Hanover, NJ 07936.

82.    Defendant Novartis Institutes for Biomedical Research, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 250 Massachusetts Avenue, Cambridge, MA 02139.

83.    Defendant Novartis Consumer Health, Inc. is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business at 200 Kimball Drive, Parsippany, NJ 07054.

84.    Defendant Novartis Corporation is the parent/holding company of Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc.

85.    At all relevant times, Defendant Novartis Corporation has exercised and exercises dominion and control over Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc.

86.    Defendant Novartis Corporation, Defendant Novartis Pharmaceutical Corporation, Defendant Novartis Institutes for Biomedical Research, Inc. and Defendant Novartis Consumer Health, Inc. are referred to collectively herein as the "Novartis Defendants."

87.    Each of the Novartis Defendants was the agent and employee of the other Novartis Defendants, and in doing the things alleged were acting within the course and scope of such agency and employment and with the other Novartis Defendants' actual and implied permission, consent, authorization and approval.

88.    In 2005, the Novartis Defendants obtained the rights to market the over-the counter version of Prevacid, Prevacid 24HR, from Defendant TAP.

89.    As a part of their business and at all relevant times, the Novartis Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Prevacid 24 HR.

90.    The Novartis Defendants, in collaboration amongst themselves, designed and developed the Prevacid 24 HR.

91.    Defendant Novartis Pharmaceuticals Corporation has been the holder of approved NDA 022327 for Prevacid 24HR.

92.    The Novartis Defendants manufacture and market Prevacid 24HR in the United States.  The Novartis Defendants have transacted and conducted business related to Prevacid 24HR in each of the States and Territories of the United States.

93.    The Novartis Defendants have derived substantial revenue from Prevacid 24HR in each of the States and Territories of the United States.

94.    The Novartis Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid 24HR.

95.    Defendant Pfizer Inc. is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 235 East 42nd Street, New York, NY 10017.

96.    On October 15, 2009, Defendant Pfizer Inc. acquired Defendant Wyeth Pharmaceuticals, Inc. and, since that time, has been the parent/holding company of the Wyeth Defendants.

97.    As a part of their business and at all relevant times, Defendant Pfizer Inc. has been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of the drugs Protonix (pantoprazole) and Nexium 24HR.

98.    In or about 2012, Defendant Pfizer Inc. entered into a marketing agreement with the AstraZeneca Defendants whereby Defendant Pfizer Inc. acquired the rights to market Nexium 24HR products.

99.    On or about March 28, 2014, Defendant Pfizer Inc., in collaboration with and pursuant to its marketing agreement with the AstraZeneca Defendants, was granted FDA approval to market Nexium 24HR products.

100.    Defendant Pfizer Inc. makes Nexium 24HR available for purchase in the United States in and around 2014 and continues to manufacture and market Nexium 24HR in the United States.

101.    Defendant Pfizer Inc. manufactures and markets Protonix in the United States.

102.    Defendant Pfizer Inc. has transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

103.    Defendant Pfizer Inc. has derived substantial revenue from PPI Products in each of the States and Territories of the United States.

104.    Defendant Pfizer Inc. has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

105.    Defendant The Procter & Gamble Company is and, all times relevant to this action, has been an Ohio corporation with its principal place of business at 1 Procter & Gamble Plaza, Cincinnati, OH 45202.

106.    Defendant Procter & Gamble Manufacturing Company is and, all times relevant to this action, has been an Ohio corporation with its principal place of business at 3875 Reservoir Road, Lima, OH 45801.

107.    At all times relevant to this action Defendant The Procter & Gamble Company has been the direct or indirect owner of substantially all of the stock or other ownership interests of Defendant Procter & Gamble Manufacturing Company.

108.    Defendant The Procter & Gamble Company and Defendant Procter & Gamble Manufacturing Company are referred to collectively herein as the "Procter & Gamble Defendants."

109.    Each of the Procter & Gamble Defendants was the agent and employee of the other Procter & Gamble Defendant, and in doing the things alleged were acting within the course and scope of such agency and employment and with the other Procter & Gamble Defendant's actual and implied permission, consent, authorization and approval.

110.    The Procter & Gamble Defendants, in collaboration amongst themselves and the AstraZeneca Defendants, designed and developed Prilosec OTC.

111.    As a part of their business and at all relevant times, the Procter & Gamble Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Prilosec OTC.

112.    In or about 1997, Defendant The Procter & Gamble Company entered into a marketing agreement with Defendant AstraZeneca LP whereby the Procter & Gamble Defendants acquired the rights to market Prilosec OTC products.

113.    On or about January 27, 2000, Defendant The Procter & Gamble Company, in collaboration with and pursuant to its marketing agreement with Defendant AstraZeneca LP, submitted NDA 021229 for Prilosec OTC delayed release tablets.

114.    On or about June 20, 2003, Defendant The Procter & Gamble Company, in collaboration with and pursuant to its marketing agreement with Defendant AstraZeneca LP, was granted approval for NDA 021229, Prilosec OTC.

115.    The Procter & Gamble Defendants made Prilosec OTC available for purchase in the United States on or about October 2003 and continue to manufacture and market each formulation of Prilosec OTC in the United States.

116.    The Procter & Gamble Defendants have transacted and conducted business related to Prilosec OTC in each of the States and Territories of the United States.

117.    The Procter & Gamble Defendants have derived substantial revenue from Prilosec OTC in each of the States and Territories of the United States.

118.    The Procter & Gamble Defendants have expected or should have expected their acts to have consequences within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prilosec OTC.

119.    Defendant Takeda Pharmaceuticals USA, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

120.    Defendant Takeda Pharmaceuticals America, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

121.    Defendant Takeda Pharmaceuticals LLC is and, at all times relevant to this action, has been an Illinois limited liability company having a principal place of business at One Takeda Parkway, Deerfield, Ill 60015.

122.    Defendant Takeda Pharmaceuticals, LLC, at all times relevant to this action, has been wholly owned by Defendant Takeda Pharmaceuticals America, Inc. and Defendant Takeda Pharmaceuticals USA, Inc.

123.    Defendant Takeda Pharmaceuticals International, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, IL 60015.

124. Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc. is and, at all times relevant to this action, has been an Illinois corporation having a principal place of business at One Takeda Parkway, Deerfield, IL 60015.

125. Defendant Takeda Pharmaceutical Company Limited is and, at all times relevant to this action, has been a Japanese corporation having a principal place of business at 1-1, Doshomachi 4-chome, Chuoku, Osaka, Japan.

126. Defendant Takeda Pharmaceutical Company Limited is and, at all times relevant to this action, has been the parent/holding company of Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International Inc. and Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center Inc.

127. Defendant Takeda Pharmaceutical Company Limited, at all times relevant to this action, has exercised and exercises dominion and control over Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International Inc. and Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center Inc.

128. Defendant Takeda Pharmaceuticals USA, Inc., Defendant Takeda Pharmaceuticals America, Inc., Defendant Takeda Pharmaceuticals LLC, Defendant Takeda Pharmaceuticals International, Inc., Defendant Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc. and Defendant Takeda Pharmaceutical Company Limited are referred to collectively herein as the "Takeda Defendants."

129. Each of the Takeda Defendants was the agent and employee of the other Takeda Defendants and, in doing the things alleged, was acting within the course and scope of such agency

and employment and with the other Takeda Defendants' actual and implied permission, consent, authorization and approval.

130.    As a part of their business and at all relevant times, the Takeda Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of Dexilant (dexlansoprazole), Prevacid, Prevacid24HR and Protonix products.

131.    The Takeda Defendants, in collaboration amongst themselves, designed and developed the Dexilant, Prevacid, Prevacid 24HR and Protonix products.

132.    Defendant Takeda Pharmaceuticals USA, Inc. is the holder of approved NDAs022287 and 208056 for Dexilant, and NDAs 020406, 021428 and 021281 for Prevacid.

133.    The Takeda Defendants manufacture and market each of these prescription Prevacid formulations in the United States.

134.    The Takeda Defendants manufacture and market each of these Prevacid 24HR formulations in the United States.

135.    Takeda Defendants manufacture and market each of these Dexilant formulations in the United States.

136.    The Takeda Defendants manufacture and market each of these Protonix formulations in the United States.

137.    The Takeda Defendants have transacted and conducted business related to PPI Products in each of the States and Territories of the United States.

138.    The Takeda Defendants have derived substantial revenue from PPI Products in each of the States and Territories of the United States.

139.    The Takeda Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial

revenue from interstate commerce in each of the States and Territories of the United States related to PPI Products.

140.     Defendant TAP Pharmaceutical Products, Inc. f/k/a TAP Holdings, Inc.(hereinafter "Defendant TAP") is and, at all times relevant to this action, has been a Delaware corporation having a principal place of business in Lake Forest, Ill.

141.     Defendant TAP was a joint venture created by and between Defendant Abbott and the Takeda Defendants in and around 1977.

142.     Defendant TAP filed the Investigational New Drug Application for prescription Prevacid in 1987, and filed an NDA for prescription Prevacid in 1993

143.     Defendant TAP Holdings, Inc. was the holder of NDA 020406 for prescription Prevacid, which was approved for sale in the United States in 1995.

144.     In 2005, Defendant TAP sold the rights to market an over-the-counter version of Prevacid, Prevacid 24HR, to Defendant Novartis Consumer Healthcare.

145.     Defendant TAP dissolved in 2008 and, at that time, the Takeda Defendantsreceived the rights to Dexilant, Prevacid and Prevacid 24HR products in the United States.

146.     Defendant TAP manufactured and marketed Prevacid in the United States.

147.     Defendant TAP has transacted and conducted business related to Prevacid in each of the States and Territories of the United States.

148.     Defendant TAP has derived substantial revenue from Prevacid in each of the States and Territories of the United States.

149.     Defendant TAP has expected or should have expected its acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Prevacid.

21

150.    Defendant Wyeth Pharmaceuticals Inc. is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA.

151.    Defendant Wyeth-Ayerst Laboratories is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA.

152.    Defendant Wyeth-Ayerst Laboratories is a wholly-owned subsidiary of Defendant Wyeth Pharmaceuticals, Inc.

153.    In 2009 Defendant Pfizer Inc. acquired Defendant Wyeth Pharmaceuticals Inc. and, since that time, Defendant Wyeth Pharmaceuticals, Inc. has been a wholly owned subsidiary of Defendant Pfizer, Inc.

154.    On November 9, 2009, Defendant Wyeth Pharmaceuticals, Inc. converted into a Delaware limited liability company, Wyeth LLC.

155.    Defendant Wyeth LLC is and, all times relevant to this action, has been a Delaware corporation having a principal place of business at 500 Arcola Rd. Collegeville, PA, and is a wholly-owned subsidiary of Defendant Pfizer Inc.

156.    Defendant Wyeth Pharmaceuticals, Inc., Defendant Wyeth-Ayerst Laboratories and Defendant Wyeth LLC are referred to collectively herein as the "Wyeth Defendants."

157.    At all relevant times, Defendant Pfizer Inc. exercised and exercises dominion and control over the Wyeth Defendants.

158.    Each of the Wyeth Defendants was the agent and employee of the other Wyeth Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Wyeth Defendants' actual and implied permission, consent, authorization and approval.

159.    As a part of their business and at all relevant times, the Wyeth Defendants have been involved in the design, research, manufacture, testing, advertisement, promotion, marketing, sale and distribution of prescription Protonix products.

160.    The Wyeth Defendants, in collaboration amongst themselves, designed and developed the prescription Protonix products.

161.    Defendant Wyeth-Ayerst Laboratories is the holder of approved NDAs 020987and 020988 for Protonix.

162.    Defendant Wyeth Pharmaceuticals, Inc. is the holder of approved NDA 022020for Protonix.

163.    The Wyeth Defendants manufacture and market Protonix in the United States.

164.    The Wyeth Defendants have transacted and conducted business related to Protonix in each of the States and Territories of the United States.

165.    The Wyeth Defendants have derived substantial revenue from Protonix in each of the States and Territories of the United States.

166.    The Wyeth Defendants have expected or should have expected their acts to have consequence within each of the States and Territories of the United States, and derived substantial revenue from interstate commerce in each of the States and Territories of the United States related to Protonix.

167.    In doing the acts alleged herein, said Defendants were acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence, and ratification of each other.

168.    On information and belief, Defendants have transacted and conducted business in the State of California, and/or contracted to supply goods and services within the State of California, and these causes of action have arisen from the same.

169.    On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and the State of California.

170.    On information and belief, at all relevant times, Defendants derived and derive substantial revenue from goods and products used in the State of California and from interstate commerce.

171.    On information and belief, at all relevant times, Defendants committed tortious acts within the State of California causing injury within the State of California, out of which act(s) these causes of action arise.

IV.    **PLAINTIFF PARTIES**

Plaintiffs incorporate all preceding and succeeding paragraphs in this complaint as if fully set forth at length herein, and further allege as follows:

172.    Each party residing with and lawfully wedded to a Plaintiff  (a) alleging personal injury claims for him or herself, or (b) on whose behalf personal injury claims are alleged by reason of Plaintiff's death or other incapacity hereinafter may, at times, be referred to as "Plaintiff-Spouse," or all such parties may, at times, be collectively referred to herein as "Plaintiff-Spouses."

173.    Each deceased Plaintiff in this action, when referred to individually, or all deceased Plaintiffs when referred to collectively, may, at times, hereinafter be referred to as a "Plaintiff-Decedent" or "Plaintiff-Decedents," respectively.

174.    Plaintiff, EUGENE FISHER, alleges as follows:

   a.    Plaintiff, EUGENE FISHER, was a resident of the city of Englewood, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.    Plaintiff, EUGENE FISHER, ingested PPIs between approximately January 2014 and November 2017.

   c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff EUGENE FISHER suffered Acute Kidney Injury, Chronic Kidney Disease, Dialysis, Acute Renal Failure and resulting damages.

175.    Plaintiff, STEVE GIROUX, alleges as follows:

   a.    Plaintiff, STEVE GIROUX, was a resident of the city of Quartz Hill, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.    Plaintiff, STEVE GIROUX, ingested PPIs between approximately January 2002 and December 2016.

   c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff STEVE GIROUX suffered Chronic Kidney Disease and resulting damages.

176.    Plaintiff, CLOYD HOLMES JR, alleges as follows:

   a.    Plaintiff, CLOYD HOLMES JR, was a resident of the city of Twentynine Palms, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.    Plaintiff, CLOYD HOLMES JR, ingested PPIs between approximately May 2014 and June 2015.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff CLOYD HOLMES JR suffered Chronic Kidney Disease and resulting damages.

177. Plaintiff, GERMAINE JANRHETT, alleges as follows:

a. Plaintiff, GERMAINE JANRHETT, was a resident of the city of Rancho Cucamonga, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, GERMAINE JANRHETT, ingested PPIs between approximately January 1993 and September 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff GERMAINE JANRHETT suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis, Acute Renal Failure and resulting damages.

178. Plaintiff, MAVIO BARTON, alleges as follows:

a. Plaintiff, MAVIO BARTON, was a resident of the city of Laguna Woods, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, MAVIO BARTON, ingested PPIs between approximately February 2006 and May 2010.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MAVIO BARTON suffered Chronic Kidney Disease and resulting damages.

179. Plaintiff, RON GILBERT, alleges as follows:

a. Plaintiff, RON GILBERT, was a resident of the city of Huntington Beach, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.  Plaintiff, RON GILBERT, ingested PPIs between approximately September 1989 and June 2016.

   c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff RON GILBERT suffered Chronic Kidney Disease and resulting damages.

180.   Plaintiff, HOWARD RASHKOW, alleges as follows:

   a.  Plaintiff, HOWARD RASHKOW, was a resident of the city of Laguna Woods, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.  Plaintiff, HOWARD RASHKOW, ingested PPIs between approximately March 1996 and July 2016.

   c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff HOWARD RASHKOW suffered Chronic Kidney Disease, Acute Renal Failure and resulting damages.

181.   Plaintiff, DIANA SHARP, alleges as follows:

   a.  Plaintiff, DIANA SHARP, was a resident of the city of Portola Hills, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.  Plaintiff, DIANA SHARP, ingested PPIs between approximately January 2003 and December 2009.

   c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DIANA SHARP suffered Chronic Kidney Disease, End Stage Renal Disease, Acute Renal Failure and resulting damages.

182.   Plaintiff, SAMUEL KWAKU AGYEI FOSU GODMAN, alleges as follows:

a.  Plaintiff, SAMUEL KWAKU AGYEI FOSU GODMAN, was a resident of the city of Fontana, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, SAMUEL KWAKU AGYEI FOSU GODMAN, ingested PPIs between approximately January 2015 and January 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SAMUEL KWAKU AGYEI FOSU GODMAN suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis, Acute Renal Failure and resulting damages.

183.  Plaintiff, RICHARD BENNETT, alleges as follows:

a.  Plaintiff, RICHARD BENNETT, was a resident of the city of Victorville, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, RICHARD BENNETT, ingested PPIs between approximately January 2011 and April 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff RICHARD BENNETT suffered Chronic Kidney Disease and resulting damages.

184.  Plaintiff, DANNY BRAKE, alleges as follows:

a.  Plaintiff, DANNY BRAKE, was a resident of the city of Hemet, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, DANNY BRAKE, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DANNY BRAKE suffered Chronic Kidney Disease and resulting damages.

185.    Plaintiff, RAYMOND CHISM, alleges as follows:

a.  Plaintiff, RAYMOND CHISM, was a resident of the city of Victorville, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, RAYMOND CHISM, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff RAYMOND CHISM suffered Chronic Kidney Disease and resulting damages.

186.    Plaintiff, KATRINA CORLIS, alleges as follows:

a.  Plaintiff, KATRINA CORLIS, was a resident of the city of Beaumont, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, KATRINA CORLIS, ingested PPIs between approximately January 1999 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff KATRINA CORLIS suffered Acute Kidney Injury, Chronic Kidney Disease, Acute Renal Failure and resulting damages.

187.    Plaintiff, JAMES CORUM, alleges as follows:

a.  Plaintiff, JAMES CORUM, was a resident of the city of Banning, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, JAMES CORUM, ingested PPIs between approximately January 2001 and March 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff JAMES CORUM suffered Chronic Kidney Disease and resulting damages.

188.  Plaintiff, KAREN FARQUHARSON, alleges as follows:

a.  Plaintiff, KAREN FARQUHARSON, was a resident of the city of Idyllwild, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, KAREN FARQUHARSON, ingested PPIs between approximately September 2009 and November 2012.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff KAREN FARQUHARSON suffered Acute Interstitial Nephritis, Chronic Kidney Disease and resulting damages.

189.  Plaintiff, SANDY FIKE, alleges as follows:

a.  Plaintiff, SANDY FIKE, was a resident of the city of Yucca Valley, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, SANDY FIKE, ingested PPIs between approximately January 2000 and April 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SANDY FIKE suffered Chronic Kidney Disease, Acute Renal Failure and resulting damages.

190.  Plaintiff, NORMA FUENTES, alleges as follows:

    a.   Plaintiff, NORMA FUENTES, was a resident of the city of Fontana, California, and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, NORMA FUENTES, ingested PPIs between approximately September 1989 and April 2016.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff NORMA FUENTES suffered Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

191.    Plaintiff, MARY HEIGHT, alleges as follows:

    a.   Plaintiff, MARY HEIGHT, was a resident of the city of Hesperia, California, and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, MARY HEIGHT, ingested PPIs between approximately September 1989 and December 2017.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MARY HEIGHT suffered Chronic Kidney Disease and resulting damages.

192.    Plaintiff, DIONNE HENDERSON, alleges as follows:

    a.   Plaintiff, DIONNE HENDERSON, was a resident of the city of Victorville, California, and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, DIONNE HENDERSON, ingested PPIs between approximately January 2012 and January 2018.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DIONNE HENDERSON suffered Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

193.    Plaintiff, PAULA IIDA, alleges as follows:

a.  Plaintiff, PAULA IIDA, was a resident of the city of Sun City, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, PAULA IIDA, ingested PPIs between approximately January 2000 and April 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff PAULA IIDA suffered Chronic Kidney Disease and resulting damages.

194.    Plaintiff, SIMON JIMENEZ, alleges as follows:

a.  Plaintiff, SIMON JIMENEZ, was a resident of the city of Hemet, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, SIMON JIMENEZ, ingested PPIs between approximately June 2014 and November 2015.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SIMON JIMENEZ suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis and resulting damages.

195.    Plaintiff, LEONARD KRALL, alleges as follows:

a.  Plaintiff, LEONARD KRALL, was a resident of the city of Sun City, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, LEONARD KRALL, ingested PPIs between approximately January 2011 and May 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff LEONARD KRALL suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis, Acute Renal Failure and resulting damages.

196.    Plaintiff, DAVID CHARLES LASBY, alleges as follows:

a. Plaintiff, DAVID CHARLES LASBY, was a resident of the city of Yucca Valley, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, DAVID CHARLES LASBY, ingested PPIs between approximately January 2010 and January 2016.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DAVID CHARLES LASBY suffered Acute Kidney Injury, Chronic Kidney Disease, Acute Renal Failure and resulting damages.

197.    Plaintiff, SANDRA LENT, alleges as follows:

a. Plaintiff, SANDRA LENT, was a resident of the city of San Bernardino, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, SANDRA LENT, ingested PPIs between approximately September 1989 and October 2011.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SANDRA LENT suffered Chronic Kidney Disease and resulting damages.

198.    Plaintiff, VIRGINIA LEYVA, alleges as follows:

a.  Plaintiff, VIRGINIA LEYVA, was a resident of the city of Fontana, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, VIRGINIA LEYVA, ingested PPIs between approximately January 2009 and March 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff VIRGINIA LEYVA suffered Chronic Kidney Disease, Acute Renal Failure and resulting damages.


199.   Plaintiff, BETTYJO LONG, alleges as follows:

a.  Plaintiff, BETTYJO LONG, was a resident of the city of Desert Hot Springs, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, BETTYJO LONG, ingested PPIs between approximately May 2016 and March 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BETTYJO LONG suffered Chronic Kidney Disease and resulting damages.


200.   Plaintiff, ROBERT LOPEZ, alleges as follows:

a.  Plaintiff, ROBERT LOPEZ, was a resident of the city of Upland, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ROBERT LOPEZ, ingested PPIs between approximately September 1989 and November 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ROBERT LOPEZ suffered Chronic Kidney Disease and resulting damages.

34

201.    Plaintiff, TONY LOPEZ, alleges as follows:

a.  Plaintiff, TONY LOPEZ, was a resident of the city of Indio, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, TONY LOPEZ, ingested PPIs between approximately January 2003 and December 2014.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff TONY LOPEZ suffered Chronic Kidney Disease, End Stage Renal Disease, Transplant and resulting damages.

202.    Plaintiff, MARK LYNCH, alleges as follows:

a.  Plaintiff, MARK LYNCH, was a resident of the city of Phelan, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, MARK LYNCH, ingested PPIs between approximately September 1989 and March 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MARK LYNCH suffered Chronic Kidney Disease and resulting damages.

203.    Plaintiff, BECKY MANNING, alleges as follows:

a.  Plaintiff, BECKY MANNING, was a resident of the city of Trona, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, BECKY MANNING, ingested PPIs between approximately September 1989 and December 2017.

    c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
BECKY MANNING suffered Chronic Kidney Disease and resulting damages.

204.   Plaintiff, RICHARD MCCLAIN, alleges as follows:

    a.  Plaintiff, RICHARD MCCLAIN, was a resident of the city of Helendale, California,
and, therefore, was a domiciliary and citizen of the State of California.

    b.  Plaintiff, RICHARD MCCLAIN, ingested PPIs between approximately January 1990
and March 2018.

    c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
RICHARD MCCLAIN suffered Chronic Kidney Disease and resulting damages.

205.   Plaintiff, CANDELARIO MENDOZA, alleges as follows:

    a.  Plaintiff, CANDELARIO MENDOZA, was a resident of the city of Rialto, California,
and, therefore, was a domiciliary and citizen of the State of California.

    b.  Plaintiff, CANDELARIO MENDOZA, ingested PPIs between approximately January
2008 and May 2016.

    c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
CANDELARIO MENDOZA suffered Chronic Kidney Disease, End Stage Renal
Disease and resulting damages.

206.   Plaintiff, JEFFREY MONTGOMERY, alleges as follows:

a.  Plaintiff, JEFFREY MONTGOMERY, was a resident of the city of Norco, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, JEFFREY MONTGOMERY, ingested PPIs between approximately January 2007 and December 2012.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff JEFFREY MONTGOMERY suffered Chronic Kidney Disease and resulting damages.

207.   Plaintiff, ALLISON MUPAS, alleges as follows:

a.  Plaintiff, ALLISON MUPAS, was a resident of the city of Palm Desert, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ALLISON MUPAS, ingested PPIs between approximately January 1999 and April 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ALLISON MUPAS suffered Chronic Kidney Disease and resulting damages.

208.   Plaintiff, BERNADETTE NEREY, alleges as follows:

a.  Plaintiff, BERNADETTE NEREY, was a resident of the city of Redlands, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, BERNADETTE NEREY, ingested PPIs between approximately January 2004 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BERNADETTE NEREY suffered Acute Interstitial Nephritis, Chronic Kidney Disease and resulting damages.

209.    Plaintiff, MARY PAGE, alleges as follows:

    a.    Plaintiff, MARY PAGE, was a resident of the city of Barstow, California, and,

therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, MARY PAGE, ingested PPIs between approximately September 1989 and

July 2017.

    c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

MARY PAGE suffered Chronic Kidney Disease and resulting damages.

210.    Plaintiff, LINDA PALAFOX, alleges as follows:

    a.    Plaintiff, LINDA PALAFOX, was a resident of the city of Desert Hot Springs,

California, and, therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, LINDA PALAFOX, ingested PPIs between approximately January 2001 and

June 2015.

    c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

LINDA PALAFOX suffered Chronic Kidney Disease and resulting damages.

211.    Plaintiff, SANDRA PARKER, alleges as follows:

    a.    Plaintiff, SANDRA PARKER, was a resident of the city of Victorville, California,

and, therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, SANDRA PARKER, ingested PPIs between approximately January 2008

and March 2016.

    c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

SANDRA PARKER suffered Chronic Kidney Disease and resulting damages.

212.    Plaintiff, MARIELA PEREZ, alleges as follows:

    a.    Plaintiff, MARIELA PEREZ, was a resident of the city of Rialto, California, and,
therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, MARIELA PEREZ, ingested PPIs between approximately September 1989
and December 2017.

    c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
MARIELA PEREZ suffered Chronic Kidney Disease and resulting damages.

213.    Plaintiff, IRLINE QUICK, alleges as follows:

    a.    Plaintiff, IRLINE QUICK, was a resident of the city of Victorville, California, and,
therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, IRLINE QUICK, ingested PPIs between approximately March 1995 and
January 2015.

    c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
IRLINE QUICK suffered Chronic Kidney Disease and resulting damages.

214.    Plaintiff, DOROTHY RAKESTRAW, alleges as follows:

    a.    Plaintiff, DOROTHY RAKESTRAW, was a resident of the city of Apple Valley,
California, and, therefore, was a domiciliary and citizen of the State of California.

    b.    Plaintiff, DOROTHY RAKESTRAW, ingested PPIs between approximately
September 1989 and December 2017.

   c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DOROTHY RAKESTRAW suffered Chronic Kidney Disease and resulting damages.

215.   Plaintiff, BRENT RIOS, alleges as follows:

   a.   Plaintiff, BRENT RIOS, was a resident of the city of Hemet, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.   Plaintiff, BRENT RIOS, ingested PPIs between approximately September 1989 and December 2017.

   c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BRENT RIOS suffered Chronic Kidney Disease and resulting damages.

216.   Plaintiff, JORGE RUIZ, alleges as follows:

   a.   Plaintiff, JORGE RUIZ, was a resident of the city of Fontana, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.   Plaintiff, JORGE RUIZ, ingested PPIs between approximately June 2003 and May 2017.

   c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff JORGE RUIZ suffered Chronic Kidney Disease and resulting damages.

217.   Plaintiff, SUMMER STALEY-BACHA, alleges as follows:

   a.   Plaintiff, SUMMER STALEY-BACHA, was a resident of the city of Riverside, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, SUMMER STALEY-BACHA, ingested PPIs between approximately January 2005 and February 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SUMMER STALEY-BACHA suffered Chronic Kidney Disease and resulting damages.

218.   Plaintiff, GREGORY VANCE, alleges as follows:

a. Plaintiff, GREGORY VANCE, was a resident of the city of San Bernardino, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, GREGORY VANCE, ingested PPIs between approximately September 1989 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff GREGORY VANCE suffered Chronic Kidney Disease and resulting damages.

219.   Plaintiff, MARTIN VILLA, alleges as follows:

a. Plaintiff, MARTIN VILLA, was a resident of the city of Hesperia, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, MARTIN VILLA, ingested PPIs between approximately January 1998 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MARTIN VILLA suffered Chronic Kidney Disease and resulting damages.

220.   Plaintiff, BARBARA WATKINS, alleges as follows:

a.  Plaintiff, BARBARA WATKINS, was a resident of the city of Moreno Valley, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, BARBARA WATKINS, ingested PPIs between approximately January 2000 and October 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BARBARA WATKINS suffered Acute Kidney Injury, Chronic Kidney Disease, Acute Renal Failure and resulting damages.

221.    Plaintiff, DARLENE WATSON, alleges as follows:

a.  Plaintiff, DARLENE WATSON, was a resident of the city of Moreno Valley, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, DARLENE WATSON, ingested PPIs between approximately January 2006 and January 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DARLENE WATSON suffered Chronic Kidney Disease, Acute Renal Failure and resulting damages.

222.    Plaintiff, KATHLYN WILKERSON, alleges as follows:

a.  Plaintiff, KATHLYN WILKERSON, was a resident of the city of Corona, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, KATHLYN WILKERSON, ingested PPIs between approximately January 2010 and December 2014.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff KATHLYN WILKERSON suffered Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

223. Plaintiff, MICHAEL WOOTEN, alleges as follows:

a. Plaintiff, MICHAEL WOOTEN, was a resident of the city of Mira Loma, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, MICHAEL WOOTEN, ingested PPIs between approximately September 1989 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MICHAEL WOOTEN suffered Chronic Kidney Disease and resulting damages.

224. Plaintiff, REBECCA D CARTER, alleges as follows:

a. Plaintiff, REBECCA D CARTER, was a resident of the city of Anaheim, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, REBECCA D CARTER, ingested PPIs between approximately January 1999 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff REBECCA D CARTER suffered Chronic Kidney Disease and resulting damages.

225. Plaintiff, PHYLLIS HELM, alleges as follows:

a. Plaintiff, PHYLLIS HELM, was a resident of the city of Santa Ana, California, and, therefore, was a domiciliary and citizen of the State of California.

43

b.  Plaintiff, PHYLLIS HELM, ingested PPIs between approximately January 2005 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff PHYLLIS HELM suffered Chronic Kidney Disease and resulting damages.

226.    Plaintiff, AMALIA NETTO, alleges as follows:

a.  Plaintiff, AMALIA NETTO, was a resident of the city of Anaheim, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, AMALIA NETTO, ingested PPIs between approximately September 1989 and August 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff AMALIA NETTO suffered Chronic Kidney Disease and resulting damages.

227.    Plaintiff, LAWRENCE RODICK, alleges as follows:

a.  Plaintiff, LAWRENCE RODICK, was a resident of the city of Anaheim, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, LAWRENCE RODICK, ingested PPIs between approximately September 1989 and December 2012.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff LAWRENCE RODICK suffered Chronic Kidney Disease and resulting damages.

228.    Plaintiff, LINDA RUFFIN, alleges as follows:

a. Plaintiff, LINDA RUFFIN, was a resident of the city of Anaheim, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, LINDA RUFFIN, ingested PPIs between approximately February 2000 and July 2016.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff LINDA RUFFIN suffered Chronic Kidney Disease and resulting damages.


229.    Plaintiff, ELAINE SCOTT, alleges as follows:

a. Plaintiff, ELAINE SCOTT, was a resident of the city of Tustin, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, ELAINE SCOTT, ingested PPIs between approximately September 1989 and August 2016.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ELAINE SCOTT suffered Chronic Kidney Disease and resulting damages.


230.    Plaintiff, PENNY WOLFE, alleges as follows:

a. Plaintiff, PENNY WOLFE, was a resident of the city of Huntington Beach, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, PENNY WOLFE, ingested PPIs between approximately January 1990 and June 2016.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff PENNY WOLFE suffered Chronic Kidney Disease and resulting damages.

231.    Plaintiff, GERALDINE ALSTON, alleges as follows:

   a.   Plaintiff, GERALDINE ALSTON, was a resident of the city of Inglewood, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.   Plaintiff, GERALDINE ALSTON, ingested PPIs between approximately January 2000 and December 2017.

   c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff GERALDINE ALSTON suffered Chronic Kidney Disease and resulting damages.

232.    Plaintiff, SONJA ANTHONY, alleges as follows:

   a.   Plaintiff, SONJA ANTHONY, was a resident of the city of Gardena, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.   Plaintiff, SONJA ANTHONY, ingested PPIs between approximately January 2000 and December 2012.

   c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SONJA ANTHONY suffered Chronic Kidney Disease and resulting damages.

233.    Plaintiff, MONIQUE BELL, alleges as follows:

   a.   Plaintiff, MONIQUE BELL, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

   b.   Plaintiff, MONIQUE BELL, ingested PPIs between approximately January 2007 and December 2013.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MONIQUE BELL suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis, Acute Renal Failure and resulting damages.

234.    Plaintiff, ANTWONE BLUE, alleges as follows:

a. Plaintiff, ANTWONE BLUE, was a resident of the city of North Hollywood, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, ANTWONE BLUE, ingested PPIs between approximately September 1989 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ANTWONE BLUE suffered Chronic Kidney Disease and resulting damages.

235.    Plaintiff, MARGUERITE BOGAR, alleges as follows:

a. Plaintiff, MARGUERITE BOGAR, was a resident of the city of Alhambra, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, MARGUERITE BOGAR, ingested PPIs between approximately January 2008 and May 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MARGUERITE BOGAR suffered Chronic Kidney Disease and resulting damages.

236.    Plaintiff, MICHAEL BROOKS, alleges as follows:

a. Plaintiff, MICHAEL BROOKS, was a resident of the city of Northridge, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, MICHAEL BROOKS, ingested PPIs between approximately January 2013 and March 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MICHAEL BROOKS suffered Acute Interstitial Nephritis, Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

237.  Plaintiff, ROCHELLE BROWN, alleges as follows:

a.  Plaintiff, ROCHELLE BROWN, was a resident of the city of Reseda, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ROCHELLE BROWN, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ROCHELLE BROWN suffered Chronic Kidney Disease and resulting damages.

238.  Plaintiff, ANTHONYEA CASTELLI, alleges as follows:

a.  Plaintiff, ANTHONYEA CASTELLI, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ANTHONYEA CASTELLI, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ANTHONYEA CASTELLI suffered Chronic Kidney Disease and resulting damages.

239.  Plaintiff, DOLORES CHAPA, alleges as follows:

a.  Plaintiff, DOLORES CHAPA, was a resident of the city of Los Osos, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, DOLORES CHAPA, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DOLORES CHAPA suffered Chronic Kidney Disease and resulting damages.

240.   Plaintiff, SHEILA CLAYTON, alleges as follows:

a.  Plaintiff, SHEILA CLAYTON, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, SHEILA CLAYTON, ingested PPIs between approximately March 2009 and October 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SHEILA CLAYTON suffered Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

241.   Plaintiff, ROBERT DAVIS, alleges as follows:

a.  Plaintiff, ROBERT DAVIS, was a resident of the city of Thousand Oaks, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ROBERT DAVIS, ingested PPIs between approximately January 2011 and August 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ROBERT DAVIS suffered Acute Interstitial Nephritis, Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

242.    Plaintiff, RONNIE DOMINGOS, alleges as follows:

a.    Plaintiff, RONNIE DOMINGOS, was a resident of the city of Templeton, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, RONNIE DOMINGOS, ingested PPIs between approximately January 1997 and February 2017.

c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff RONNIE DOMINGOS suffered Chronic Kidney Disease and resulting damages.

243.    Plaintiff, BEVERLY FOSTER, alleges as follows:

a.    Plaintiff, BEVERLY FOSTER, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, BEVERLY FOSTER, ingested PPIs between approximately January 2011 and January 2015.

c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BEVERLY FOSTER suffered Chronic Kidney Disease and resulting damages.

244.    Plaintiff, FRED FRANKLIN, alleges as follows:

a.    Plaintiff, FRED FRANKLIN, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, FRED FRANKLIN, ingested PPIs between approximately June 2003 and August 2011.

   c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff FRED FRANKLIN suffered Chronic Kidney Disease and resulting damages.

245.   Plaintiff, MARIA GABRIEL, alleges as follows:

   a. Plaintiff, MARIA GABRIEL, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

   b. Plaintiff, MARIA GABRIEL, ingested PPIs between approximately September 1989 and December 2017.

   c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MARIA GABRIEL suffered Chronic Kidney Disease and resulting damages.

246.   Plaintiff, MICHELLE GARRETT, alleges as follows:

   a. Plaintiff, MICHELLE GARRETT, was a resident of the city of Santa Barbara, California, and, therefore, was a domiciliary and citizen of the State of California.

   b. Plaintiff, MICHELLE GARRETT, ingested PPIs between approximately September 1989 and December 2017.

   c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff MICHELLE GARRETT suffered Acute Kidney Injury, Chronic Kidney Disease and resulting damages.

247.   Plaintiff, STEPHEN GRAHAM, alleges as follows:

   a. Plaintiff, STEPHEN GRAHAM, was a resident of the city of Rowland Heights, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, STEPHEN GRAHAM, ingested PPIs between approximately January 2014 and March 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff STEPHEN GRAHAM suffered Chronic Kidney Disease and resulting damages.

248.    Plaintiff, KAREN JACKSON, alleges as follows:

a.  Plaintiff, KAREN JACKSON, was a resident of the city of Lompoc, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, KAREN JACKSON, ingested PPIs between approximately September 1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff KAREN JACKSON suffered Chronic Kidney Disease and resulting damages.

249.    Plaintiff, BEVERLY JULIEN, alleges as follows:

a.  Plaintiff, BEVERLY JULIEN, was a resident of the city of La Puente, California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, BEVERLY JULIEN, ingested PPIs between approximately January 2011 and December 2012.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff BEVERLY JULIEN suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis and resulting damages.

250.    Plaintiff, ALBERT KADOSH, alleges as follows:

a. Plaintiff, ALBERT KADOSH, was a resident of the city of Northridge, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, ALBERT KADOSH, ingested PPIs between approximately September 1989 and August 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ALBERT KADOSH suffered Chronic Kidney Disease and resulting damages.

251.   Plaintiff, SHANNEL LANGRAM, alleges as follows:

a. Plaintiff, SHANNEL LANGRAM, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, SHANNEL LANGRAM, ingested PPIs between approximately January 2012 and December 2017.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SHANNEL LANGRAM suffered Chronic Kidney Disease, End Stage Renal Disease, Dialysis, Acute Renal Failure and resulting damages.

252.   Plaintiff, DIANA L LANIER, alleges as follows:

a. Plaintiff, DIANA L LANIER, was a resident of the city of Carson, California, and, therefore, was a domiciliary and citizen of the State of California.

b. Plaintiff, DIANA L LANIER, ingested PPIs between approximately January 2009 and March 2018.

c. Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DIANA L LANIER suffered Chronic Kidney Disease and resulting damages.

253.    Plaintiff, ALEKSANDR MALYKIN, alleges as follows:

a.    Plaintiff, ALEKSANDR MALYKIN, was a resident of the city of Panorama City, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, ALEKSANDR MALYKIN, ingested PPIs between approximately January 1996 and April 2017.

c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff ALEKSANDR MALYKIN suffered Chronic Kidney Disease and resulting damages.

254.    Plaintiff, RICHARD MANOS, alleges as follows:

a.    Plaintiff, RICHARD MANOS, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, RICHARD MANOS, ingested PPIs between approximately January 1995 and May 2017.

c.    Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff RICHARD MANOS suffered Chronic Kidney Disease and resulting damages.

255.    Plaintiff, STANLEY MILLER, alleges as follows:

a.    Plaintiff, STANLEY MILLER, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

b.    Plaintiff, STANLEY MILLER, ingested PPIs between approximately November 2015 and March 2016.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
STANLEY MILLER suffered Chronic Kidney Disease and resulting damages.

256.    Plaintiff, NANCY NEWMAN, alleges as follows:

a.  Plaintiff, NANCY NEWMAN, was a resident of the city of San Dimas, California,
and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, NANCY NEWMAN, ingested PPIs between approximately January 2010
and April 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
NANCY NEWMAN suffered Chronic Kidney Disease and resulting damages.

257.    Plaintiff, FRANCES ORTIZ, alleges as follows:

a.  Plaintiff, FRANCES ORTIZ, was a resident of the city of Van Nuys, California, and,
therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, FRANCES ORTIZ, ingested PPIs between approximately September 1989
and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff
FRANCES ORTIZ suffered Chronic Kidney Disease, Dialysis and resulting damages.

258.    Plaintiff, DONALD PERKINS, alleges as follows:

a.  Plaintiff, DONALD PERKINS, was a resident of the city of Los Angeles, California,
and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, DONALD PERKINS, ingested PPIs between approximately January 1996 and August 2016.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff DONALD PERKINS suffered Chronic Kidney Disease and resulting damages.

259.   Plaintiff, VAREE ROYSTON, alleges as follows:

    a.   Plaintiff, VAREE ROYSTON, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, VAREE ROYSTON, ingested PPIs between approximately September 1989 and December 2014.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff VAREE ROYSTON suffered Chronic Kidney Disease and resulting damages.

260.   Plaintiff, SHAHANZ SHADROOZ, alleges as follows:

    a.   Plaintiff, SHAHANZ SHADROOZ, was a resident of the city of Los Angeles, California, and, therefore, was a domiciliary and citizen of the State of California.

    b.   Plaintiff, SHAHANZ SHADROOZ, ingested PPIs between approximately January 2000 and March 2018.

    c.   Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff SHAHANZ SHADROOZ suffered Chronic Kidney Disease, Urinary Disfunction and resulting damages.

261.   Plaintiff, MICHAEL THOMPSON, alleges as follows:

a.  Plaintiff, MICHAEL THOMPSON, was a resident of the city of Los Angeles,

California, and, therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, MICHAEL THOMPSON, ingested PPIs between approximately September

1989 and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

MICHAEL THOMPSON suffered Chronic Kidney Disease and resulting damages.


262.    Plaintiff, ELAINE TURNER, alleges as follows:

a.  Plaintiff, ELAINE TURNER, was a resident of the city of Lancaster, California, and,

therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, ELAINE TURNER, ingested PPIs between approximately September 1989

and December 2017.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

ELAINE TURNER suffered Chronic Kidney Disease and resulting damages.


263.    Plaintiff, LESSIE WRAGGS, alleges as follows:

a.  Plaintiff, LESSIE WRAGGS, was a resident of the city of Compton, California, and,

therefore, was a domiciliary and citizen of the State of California.

b.  Plaintiff, LESSIE WRAGGS, ingested PPIs between approximately September 1989

and March 2018.

c.  Following and as a legal, direct and proximate consequence of using PPIs, Plaintiff

LESSIE WRAGGS suffered Chronic Kidney Disease and resulting damages.

264.    Before purchasing PPIs, Plaintiffs and Plaintiffs' doctor were exposed to the advertising and marketing of Defendants. Plaintiffs relied on the representations and warranties from Defendants made therein in making their decision to purchase PPIs, believing they would be safe and effective for their advertised use and relying on the expertise of Defendants.

265.    Upon information and belief, at no time did Plaintiffs take more than the recommended dosing regimen contained in the packaging and labeling of PPIs.

266.    After taking the recommended dosing of and as a result of the PPI Products manufactured by one of the Defendant herein named, Plaintiffs suffered serious kidney injuries which required hospitalization and extensive treatment.

267.    As a result of the defective nature of PPIs, persons who ingested this product, including Plaintiffs, have suffered and may continue to suffer from Serious Kidney Injuries.

268.    Defendants concealed and continue to conceal their knowledge of PPIs' unreasonably dangerous risks from Plaintiffs, their physicians, other consumers, and the medical community. Specifically, Defendants failed to adequately inform consumers and the prescribing medical community about the magnified risk of kidney injuries related to the use of PPIs.

269.    As a result of Defendants' actions and inactions, Plaintiffs were injured due to their ingestion of PPIs, which caused and will continue to cause Plaintiffs' injuries and damages. Plaintiff accordingly seeks damages associated with these injuries.

V.    **FACTUAL ALLEGATIONS**

270.    PPI Products are indicated for the treatment of the following conditions: GERD; dyspepsia; acid peptic disease; Zollinger-Ellison syndrome; acid reflux; and peptic or stomach ulcers.

271.    PPI Products work by inhibiting the secretion of stomach acid. They shut down acid production of the active acid pumps in the stomach, thereby reducing hydrochloric acid in the stomach. The drug binds with the proton pump which inhibits the ability of the gastric parietal cell to secrete gastric acid.

272.    PPI Products are one of the most commercially successful groups of medication in the history of pharmaceutical sales in the United States. Upon information and belief, from 2003 to the present, PPIs have been one of the top ten best-selling and most dispensed forms of prescription medication in the United States each year.

273.    As of 2009, approximately 21 million Americans used one or more prescription PPI Products, accounting for nearly 20% of the drugs' global sales and earning an estimated $11 billion annually.

274.    Between the period of 2008 and 2013, prescription PPI Products had sales of over $50 billion with approximately 240 million units dispensed.

275.    According to the 2011–2012 National Health and Nutritional Examination Survey, 7.8% of US adults had used prescription PPI Products within the last 30 days.

### A.    PPI Products Cause Severe Kidney Injuries

276.    As early as October of 1992, researchers from the University of Arizona Health Sciences Center led by Stephen Ruffenach published the first article reporting PPI usage associated with kidney injury in The American Journal of Medicine.

277.    Since 1992, there have been numerous adverse case reports and scientific studies published in medical journals and reported by physicians and scientists, as well as adverse reports from national adverse drug registries, which document an association between use of PPI Products and the occurrence of kidney injuries such as AIN, AKI), CKD and ESRD.

### (i)    PPI-Induced Acute Interstitial Nephritis

278. The current warning contained on prescription PPI Products regarding the risk of AIN is far from adequate, lacking the necessary force and specificity to give patients and their healthcare providers the proper information needed to make an informed decision about whether to start or continue a drug regimen with the potential for such dire consequences. If left untreated, AIN can lead to Chronic Kidney Disease, Renal Failure, Dialysis, Kidney Transplant and/or death.

279. Defendants have also failed to adequately inform physicians, and other healthcare providers such as pharmacists, and consumers regarding the risk of AIN and the use of over-the-counter PPI Products.

280. PPI Products and/or their metabolites – substances formed via metabolism – have been found to deposit within the spaces between the tubules of the kidney and act in such a way to mediate AIN, a sudden kidney inflammation that can result in mild to severe problems.

281. PPI-induced AIN can be difficult to diagnose, with less than half of patients reporting a fever and, instead, most commonly complaining of non-specific symptoms such as fatigue, nausea and weakness.

282. Use of PPI Products may lead to subclinical AIN according to multiple studies, including but not limited to:

   a. Lazarus B, Chen Y, Wilson FP, *et al.*, *Proton Pump Inhibitor Use and the Risk of Chronic Kidney Disease*. 176 JAMA INTERNAL MED. 238 (2016); and

   b. DG Moledina & MA Perazella, *Proton Pump Inhibitors and CKD*, 27 J. AM. SOC. NEPHROL. 2926 (2016).

283. AIN's slow presentation can cause significant damage over time without those affected exhibiting acute symptoms.

284. Where AIN is subclinical, it can persist for months before a patient realizes their injury. By that time, their untreated AIN can lead to Chronic Kidney Disease and End Stage Renal

Disease requiring the patient to undergo permanent dialysis, kidney transplant or, in some cases, death.

285.    While AIN can be treated, once AIN has progressed to CKD it is incurable and can only be managed.

### (ii)    PPI-Induced Acute Kidney Injury ("AKI")

286.    Acute Kidney Injury is characterized by acute and sudden renal failure by which the kidneys fail to filtrate properly.

287.    Studies indicate that those using PPI Products are at a more than 2.5 times greater risk than the general population to suffer AKI.

288.    Studies also indicate that those who develop AIN are at a significant risk of AKI, even though they may not obviously exhibit kidney dysfunction.

289.    Currently, the product labeling for PPI Products, both prescription and over-the-counter, does not contain any warning regarding the increased risk of AKI.

290.    Where AKI is subclinical, it can persist for months before a patient realizes their injury. By that time, their untreated AKI can lead to CKD and ESRD.

### (iii)    PPI-Induced Chronic Kidney Disease

291.    In January 2016, a study published in the Journal of the American Medical Association found that use of PPI Products was independently associated with a 20 – 50% higher risk of CKD.

292.    In February 2016, a study published in the Journal of the American Society of Nephrology found that "exposure to PPI is associated with increased risk of development of CKD, progression of kidney disease, and risk of ESRD."

293.    In April 2016, a study published in the Journal of Nephrology suggested that the development of and failure to treat AIN could lead to CKD and ESRD, which requires dialysis or

kidney transplant to manage. Analyses of the study were adjusted for age, sex, race, baseline eGFR, cigarette smoking, BMI, systolic blood pressure, diabetes, a history of cardiovascular disease, antihypertensive medication use, anticoagulant medication use, statin, aspirin and NSAID use. Across all groups, "each of these sensitivity analyses showed a consistent association between PPI use and a higher risk of CKD."

294.    CKD is often a slow progressive decline in kidney function that may result in ESRD. As the kidneys lose their ability to function properly, wastes can build to high levels in the blood resulting in numerous, serious complications ranging from nerve damage and heart disease to kidney failure and death.

295.    PPI Products have also been shown to cause CKD independent of, and in the absence of, an intervening AKI or AIN event, even where the AKI or AIN is subclinical. For example, the results of a 2017 epidemiologic study "showed a significant association between PPI use and chronic renal outcomes including incident CKD, CKD progression, and ESRD in the absence of intervening AKI." Yan Xie et al., *Long-Term Kidney Outcomes among Users of Proton Pump Inhibitors without Intervening Acute Kidney Injury*, 91 KIDNEY INT'L 1482 (2017).

296.    To date, the labeling for Defendants' PPI Products lack adequate risk information about CKD.

### B.    PPI Products Caused Rebound Acid Hypersensitivity, Worsening GERD and Acid Reflux, Creating Dependency

297.    Users of PPI Products will, and have, experienced worse GERD, or acid reflux, upon ceasing PPI Product use, evidencing that PPI Products can lead to physical dependency and/or the worsening of symptoms upon removal of the PPI therapy.

298.    The worsening of GERD or acid reflux after withdrawal of PPI Products has been characterized by scientists as "rebound acid hypersecretion" and is characterized by an increase in acid secretion with the withdrawal of the PPI Products.

299.    This phenomenon was first identified during preclinical animal studies on rats treated with omeprazole/Prilosec.

300.    Because PPI Products work by preventing the acidification of the stomach's contents by blocking the proton pumps of the stomach, the body may react by compensating with increased production of gastrin, a hormone that stimulates secretion of gastric acid. Consequently, when users discontinue treatment with PPI Products, their bodies' acid production increases beyond their pre-PPI treatment levels.

301.    The increase in acid production after discontinuation of PPI Products caused and will continue to cause Plaintiffs significant harm and a dependency on PPI Products.

302.    After Plaintiffs' discontinuation of PPI Products, increased acid production to a level above that which existed before treatment with PPI Products was initiated has caused and will cause Plaintiffs to treat GERD as a more severe condition than that which existed when PPI Products were initiated.

303.    Several studies have shown that treatment with PPI Products induces acid-related symptoms like heartburn, acid regurgitation and dyspepsia once treatment is withdrawn in healthy individuals who have never before experienced heartburn or related symptoms.

304.    Due to rebound hypersecretion, patients are unable, in many instances, to cease use of PPI Products, despite choosing and wanting to do so after learning of the risks of using PPI Products, including kidney injuries.

305.    To date, the labeling for the Defendants' respective PPI Products contains no information regarding rebound acid hypersecretion or information that would assist healthcare providers and/or patients who suffer from this after ceasing to use PPI Products.

### C.    Safer Alternatives to PPIs

306.    Despite the fact that PPI Products lead to an increased risk of such severe injuries as outlined herein, several safer alternatives have been and are available, including but not limited to:

    a.    The use of over-the-counter calcium carbonate tablets that have been available since the 1930s, such as Maalox and Tums; and/or

    b.    The use of histamine H2-receptor antagonists (also known as "H2 Blockers") that were developed in the late 1960s. H2 Blockers act to prevent the production of stomach acid, work more quickly than PPI Products and are prescribed for the same indications as PPI Products. Examples of H2 Blockers include Zantac, Pepcid and Tagamet. H2 Blockers are not associated with an increased risk of kidney injuries.

307.    In spite of their commercial success and global popularity, up to 70% of PPI Products may be used inappropriately for indications or durations that were never tested or approved. D. Marks, Time to Halt the Overprescribing of Proton Pump Inhibitors, THE PHARMACEUTICAL JOURNAL (Aug. 8, 2016).

308.    Consumers, including Plaintiffs, who have used Defendants' PPI Products for the treatment of increased gastric acid have and had several alternative safer treatments available and have not been adequately warned about the significant risks and lack of benefits associated with use of PPI Products.

### D.    Injuries Resulting from PPI Products

309.     The use of PPI Products for time periods longer than those tested or approved is a direct consequence of Defendants' (1) failure to adequately and specifically warn patients and healthcare providers as to the appropriate length of usage; (2) failure to provide adequate, clear and accurate marketing materials regarding appropriate usage of PPI Products and the appropriate and approved indications; and (3) engaging in off-label promotion of their respective PPI Products for indications that were not approved.

310.     As a result of the defective nature of Defendants' PPI Products, persons who ingested Defendants' PPI Products have been exposed to significant risks stemming from unindicated and/or long-term usage, even when used as directed and/or prescribed by a physician or healthcare professional.

311.     Consumers, including Plaintiffs, who have used Defendants' PPI Products have suffered from severe kidney injuries including, but not limited to, AIN, AKI, CKD and ESRD.

312.     Consumers, including Plaintiffs, who have used Defendants' PPI Products have suffered from a worsening of acid-related symptoms like heartburn, acid regurgitation and dyspepsia once treatment with Defendants' PPI Products was withdrawn and have developed and suffered from a physical dependence on PPI treatment.

E.     **Defendants Actively Concealed the Dangers Associated with Use of PPI Products**

313.     Defendants, through their affirmative misrepresentations and/or omissions, actively concealed from Plaintiffs and Plaintiffs' physicians the true and significant risks associated with the use of Defendants' PPI Products.

314.     Defendants concealed and continue to conceal from Plaintiffs, other consumers and/or the medical community that Defendants' PPI Products can cause kidney injuries.

65

315.    Specifically, Defendants failed to adequately inform Plaintiffs, other consumers and/or the medical community about the serious risks associated with Defendants' PPI Products, and Defendants completely failed to warn against the risk of AKI, CKD and ESRD, and Defendants still fail to warn of these risks, even to this day. Defendants have concealed and continue to conceal and have failed to adequately inform Plaintiffs, other consumers, Plaintiffs' physicians and/or others within the medical community that over-the-counter PPI Products are associated with AIN, and fail to warn and inform regarding the risk of AIN developing into CKD and ESRD.

316.    Defendants concealed and continue to conceal that Defendants' PPI Products can cause consumers to become physically dependent on PPI treatment. Specifically, Defendants have failed to inform consumers and/or healthcare providers that a patient's symptoms may worsen after the withdrawal of PPI Products.

317.    As a result of Defendants' actions, Plaintiffs and/or Plaintiffs healthcare providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks identified in this Master Long Form Complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions and misrepresentations.

318.    Plaintiffs would not have used Defendants' PPI Products had Defendants properly disclosed the risks associated with long-term use.

319.    Defendants had an obligation to comply with the law in the manufacture, design and sale of Defendants' respective PPI Products.

320.    Materials, including advertisements, press releases, website publications and other communications regarding Defendants' PPI Products, are part of the labeling of the Defendants' respective PPI Products, and Defendants could have altered the same without FDA approval.

321. Defendants' marketing campaigns willfully and intentionally misrepresented the risks of PPI Products and failed to warn about the risks of acute interstitial nephritis, acute kidney failure, chronic kidney disease and other kidney injuries.

322. Defendants' marketing campaigns and advertising to consumers failed to adequately instruct consumers regarding the appropriate duration for using their respective over the-counter PPI Products.

323. Defendants knew or should have known of the risks of AIN, AKI, CKD and ESRD based on the data available to them or that could have been generated by them, including, but not limited to animal studies, mechanisms of action, pharmacodynamics, pharmacokinetics, preclinical studies, clinical studies, animal models, genetic models, analogous compounds, analogous conditions, adverse event reports, case reports, post-marketing reports and regulatory authority investigations.

324. To date Defendants have failed to submit proposed labeling for their respective PPI Products to the FDA regarding the risks of AIN.

325. To date Defendants have failed to submit proposed labeling for their respective PPI Products to the FDA regarding the risks of AKI.

326. To date Defendants have failed to submit proposed labeling for their respective PPI Products to the FDA regarding the risks of CKD.

327. At all times, Defendants could have implemented changes to the labeling of their respective PPI Products regarding the risks of AIN, AKI, CKD and ESRD.

(iv)    Defendants Violations of Federal Law

328. Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.*

329.    With respect to Defendants' PPI Products, Defendants have failed to comply with all federal standards applicable to the sale of prescription drugs including, but not limited to, one or more of the following violations:

a.   Defendants' PPI Products are misbranded pursuant to 21 U.S.C. §352 because, among other things, their labeling is false or misleading;

b.   Defendants' PPI Products are misbranded pursuant to 21 U.S.C. §352 because words, statements or other information required by or under authority of chapter 21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

c.   Defendants' PPI Products are misbranded pursuant to 21 U.S.C. §352 because their labeling does not bear adequate directions for use and/or the labeling does not bear adequate warnings against use where their use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users;

d.   Defendants' PPI Products are misbranded pursuant to 21 U.S.C. §352 because they are dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended or suggested in the labeling thereof;

e.   Defendants' PPI Products do not contain adequate directions for use pursuant to 21 CFR § 201.5, because of, among other reasons, omission, in whole or in part, or incorrect specification of (a) statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in their oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the drugs are commonly

used, (b) quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions, (c) frequency of administration or application, (d) duration or administration or application, and/or (d) route or method of administration or application;

f.   Defendants violated 21 CFR § 201.56 because the labeling of their respective prescription PPI Products were and are not informative and accurate;

g.   Defendants' prescription PPI Products are misbranded pursuant to 21 CFR § 201.56 because their labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading;

h.   Defendants violated 21 CFR § 201.57 because they failed to identify specific tests needed for monitoring of patients who took their respective prescription PPI Products;

i.   Defendants' prescription PPI products are mislabeled pursuant to 21 CFR § 201.57 because the labeling does not state the recommended usual dose, the usual dosage range, and, if appropriate, an upper limit beyond which safety and effectiveness have not been established;

j.   Defendants' over-the-counter PPI Products are mislabeled pursuant to 21 CFR §201.66 because they were and are not informative and accurate;

k.   Defendants' over-the-counter PPI Products are misbranded pursuant to 21 CFR § 201.66 because their labeling was not updated as new information became available that caused the labeling to become inaccurate, false or misleading;

l.   Defendants' PPI Products violate 21 CFR § 210.1 because the process by which they were manufactured, processed and/or held fails to meet the minimum current

good manufacturing practice of methods to be used in, and the facilities and controls to be used for, the manufacture, packing or holding of a drug to assure that they meet the requirements as to safety and have the identity and strength and meet the quality and purity characteristic that they purport or are represented to possess;

m.  Defendants' PPI Products violate 21 CFR § 210.122 because the labeling and packaging materials do not meet the appropriate specifications;

n.  Defendants' PPI Products violate 21 CFR § 211.165 because the test methods Defendants employed are not accurate, sensitive, specific and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented;

o.  Defendants' PPI Products violate 21 CFR § 211.165 in that they fail to meet established standards or specifications and any other relevant quality control criteria;

p.  Defendants' PPI Products violate 21 CFR § 211.198 because the written procedures describing the handling of all written and oral complaints regarding the PPI Products were not followed;

q.  Defendants' PPI Products violate 21 CFR § 310.303 in that they are not safe and effective for their intended use;

r.  Defendants violated 21 CFR § 310.303 by failing to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may begrounds for suspending or withdrawing approval of the application to the FDA;

s.  Defendants violated 21 CFR §§310.305 and 314.80 by failing to report adverse events associated with their respective PPI Products as soon as possible or at least within 15 days of the initial receipt of the adverse drugs experience report;

t.  Defendants violated 21 CFR §§310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with their respective PPI Products, and evaluating the cause of the adverse event;

u.  Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to promptly investigate all serious, unexpected adverse drug experiences and submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA;

v.  Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences;

w.  Defendants violated 21 CFR §§ 310.305 and 314.80 by failing to identify the reports it submitted properly, such as by labeling them as "15-day Alert report," or "15- day Alert report follow-up";

x.  Defendants violated 21 CFR § 312.32 because they failed to review all information relevant to the safety of Defendant's PPI Products or otherwise received by the Defendants from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor;

y.   Defendants violated 21 CFR § 314.80 by failing to provide periodic reports to the FDA containing (a) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval, (b) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, and/or (c) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated); and

z.   Defendants violated 21 CFR § 314.80 by failing to submit a copy of the published article from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

330.   Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiffs.

## VI.   ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead all Counts in this Complaint in the broadest sense, pursuant to all laws that may apply according to choice of law principles, including the law of the Plaintiffs' resident State.

331.   Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including but not limited to equitable tolling, class action tolling, delayed discovery, discovery rule and fraudulent concealment.

332.    Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew or, through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury and the tortious nature of the wrongdoing that caused the injury.

333.    Plaintiff is not an expert in the field of nephrology, epidemiology, or regulation and has never attended medical school.

334.    At no point has Plaintiff ever been employed as a health care professional in any capacity, be that as a doctor, physician's assistant, registered nurse, emergency medical technician, pharmacy technician, clinical laboratory technician, nurse practitioner, etc.

335.    As a result of Defendant's actions and inactions, and Plaintiff's lack of relevant training and expertise, Plaintiff and Plaintiff's prescribing physicians were unaware and could not reasonably know or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that these risks were the direct and proximate result of the Defendant's acts and omissions.

336.    Despite diligent investigation by Plaintiffs into the cause of their injuries, the nature of Plaintiffs' injuries and damages and their relationship to the Saxagliptin was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

337.    The running of the statute of limitations in this case is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiffs and/or the consuming public of the true risks associated with Saxagliptin. As a result of the

Defendants' fraudulent concealment, Plaintiffs and/or Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

338.    Furthermore, the Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of Saxagliptin. The Defendants were under a duty to disclose the true character, quality and nature of Saxagliptin because this was nonpublic information over which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to the Plaintiffs, their medical providers and/or to their health facilities.

339.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks. Plaintiffs and/or medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks and, instead, were forced to rely on Defendants' representations.

340.    Defendants were and continue to be in possession of information and data that show the risk and dangers that Saxagliptin causes, which is not otherwise in the possession or available to Plaintiffs and/or their physicians.

341.    At the time of Plaintiffs' injuries, Plaintiffs and/or Plaintiffs' physicians were not aware of any facts which would have made a reasonably prudent person suspicious of Defendants' wrongdoing because Plaintiffs and Plaintiffs' physicians reasonably relied on Defendants' representations that Saxagliptin do not cause kidney injury.

342.    At no time prior to Plaintiffs' eventual discovery of wrongdoing did any of Plaintiffs' doctors ever inform, advise, suggest or otherwise imply that Plaintiffs' PPI use was a potential contributing cause of Plaintiffs' kidney injuries.

343.    Plaintiffs reasonably relied on the skill and judgment of Plaintiffs' doctors and had no reason to further investigate, inquire into or suspect that Saxagliptin caused Plaintiffs' conditions.

344.    Plaintiffs exercised reasonable diligence in an attempt to discover the cause of their cardiovascular injuries. Plaintiffs relied on their physicians to advise them of any known complications. Plaintiffs had no reason to believe their injuries were the result of any wrongdoing, whether intentional and/or negligent, until the discovery dates suggested below and are therefore relying on the benefit of the discovery rule.

345.    The Plaintiffs had neither knowledge nor reason to suspect that the Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by the Defendants, the Plaintiffs could not have reasonably discovered the wrongdoing at the time of his injury.

346.    At the time of Plaintiffs' injuries, Plaintiffs did not have access to or actually receive any studies or information recognizing the increased risk of cardiovascular events, including heart failure, congestive heart failure, cardiac failure, death from heart failure, and other serious health conditions, caused by Saxagliptin use or have any discussions with their doctors that there was an association between their cardiovascular events and/or injuries and Saxagliptin use.

## VII.    CAUSES OF ACTION

## COUNT I

## CAUSE OF ACTION FOR NEGLIGENCE

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

347.    At all times herein mentioned, Defendants, owed a duty to Plaintiffs to exercise reasonable care in researching, developing, testing for safety, formulating, manufacturing, compounding, labeling, packaging, promoting, advertising, marketing, distributing, selling, supplying and otherwise releasing into the stream of commerce PPIs in such a way as to avoid harm to persons upon whom they are used, such as Plaintiffs, or to refrain from such activities following knowledge and/or constructive knowledge that such product is harmful to persons upon whom it is used.

348.    Defendants owed a duty to Plaintiffs warn of the hazards and dangers associated with the use of its PPIs for patients so as to avoid harm.

349.    Defendants themselves, and acting by and through their authorized divisions, subsidiaries, agents, servants, and employees, breached their duty of reasonable care to Plaintiffs in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled and/or sold PPIs. Specifically, Defendants failed to exercise reasonable care in ways which included, but were not limited to, one or more of the following particulars:

        a.    failing to conduct adequate and appropriate testing of their PPIs.

        b.    putting proton pump inhibitor PPIs on the market without first conducting adequate testing to determine possible side effects;

        c.    putting proton pump inhibitor PPIs on the market without adequate testing their dangers to humans;

d.      failing to recognize the significance of their own and other testing of, and information regarding proton pump inhibitor PPIs, which testing evidenced such PPIs are potentially harmful to humans;

e.      failing to respond promptly and appropriately to their own and other testing of, and information regarding proton pump inhibitor PPIs, which indicated such PPIs are potentially harmful to human;

f.      failing to promptly and adequately warn of the potential of proton pump inhibitor PPIs to be harmful to humans;

g.      failing to promptly and adequately warn of the potential for kidney injuries including acute interstitial nephritis, acute kidney injuries, and chronic kidney disease when using proton pump inhibitor PPIs;

h.      failing to promptly, adequately, and appropriately recommend testing and monitoring of patients upon whom these PPIs were used in light of such PPIs potential harm to humans;

i.      failing to properly, appropriately, and adequately monitor the post-market performance of proton pump inhibitors and such PPIs effects on patients;

j.      concealing from the FDA, National Institutes of Health, the general medical community and/or physicians, their full knowledge and experience regarding the potential that proton pump inhibitors are harmful to humans;

k.      promoting, marketing, advertising and/or selling PPIs for use on patients given their knowledge and experience of such PPIs' potential harmful effects;

l.      failing to withdraw PPIs from the market, restrict their use and/or warn of such PPIs' potential dangers, given their knowledge of the potential for its harm to humans;

m.      failing to fulfill the standard of care required of a reasonable, prudent, PPIs manufacturer engaged in the manufacture of PPIs

n.      placing and/or permitting the placement of PPIs into the stream of commerce without warnings of the potential for said PPIs to be harmful to humans and/or without properly warning of said PPIs' dangerousness;

o.      Failing to disclose to the medical community in an appropriate and timely manner, facts relative to the potential of PPIs to be harmful to humans;

p.      failing to respond or react promptly and appropriately to reports of PPIs causing harm to patients;

q.      disregarding the safety of users and consumers of PPIs, including Plaintiff, Donald Crawford, under the circumstances by failing adequately to warn of said PPIs' potential harm to humans;

r.      disregarding the safety of users and consumers of PPIs, including Plaintiff, Donald Crawford, and/or his physicians' and/or hospital, under the circumstances by failing to withdraw said PPIs from the market and/or restrict their usage;

s.      disregarding publicity, government and/or industry studies, information, documentation and recommendations, consumer complaints and reports and/or other information regarding the hazards of PPIs and their potential harm to humans;

t.      failing to exercise reasonable care in informing physicians and/or hospitals using PPIs about their own knowledge regarding said PPIs' potential harm to humans;

u.      failing to remove PPIs from the stream of commerce;

v.      failing to test PPIs properly and/or adequately so as to determine their safety for use;

w.      promoting PPIs on websites aimed at creating user and consumer demand;

78

x.      failing to conduct and/or respond to post-marketing surveillance of complications and injuries;

y.      failing to use due care under the circumstances; and,

z.      such other acts or omissions constituting negligence and carelessness as

aa.     may appear during the course of discovery or at the trial of this matter.

350.    Defendants, knew or should have known that consumers, such as Plaintiffs herein, would foreseeably suffer injury as a result of the Defendants failure to exercise reasonable and ordinary care.

351.    As a direct and proximate result of Defendant's carelessness and negligence, and of the unreasonably dangerous and defective characteristics of PPIs, Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  The injuries and damages alleged herein are permanent and will continue into the future.

## COUNT II

## CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

352.    At all times material to this action, Defendants were responsible for designing, developing, researching, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, the PPIs, which are defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiffs.

353.    At all times material to this action, PPIs were manufactured, distributed, and/or sold by Defendants in a defective and unreasonably dangerous condition.

354.    In light of the potential and actual risk of harm associated with the product's use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PPIs should not have been marketed in that condition.

355.    At all times relevant herein, Defendants knew that PPIs would be prescribed by doctors to members of the general public who would rely upon the representations made by Defendants on the product label and in their marketing including public statements and promotional and sales materials.

356.    At all times material to this action, PPIs were expected to reach, and did reach, consumers in the State of California and throughout the United States, including Plaintiff, without substantial change in the condition in which it was sold.

357.    Defendants knew or should have known of the defective nature of PPIs, but continued to research, develop, design, test, manufacture, package, formulate, inspect, label, distribute, market, promote, sell and otherwise release this product into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their product, including serious medical side effects and injuries.

358.    At all times, Plaintiffs used PPIs for their intended or reasonably foreseeable purpose.

359.    As a direct and proximate result of the defective and unreasonably dangerous condition of PPIs and of their failure to perform safely, Plaintiffs suffered injuries as set forth above.

**COUNT III**

## CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY –

## DESIGN DEFECT

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

360.    At all times material to this action, Defendants were responsible for designing, developing, researching, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, the PPIs, which are and were defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiffs.

361.    At all times material to this action, PPIs were was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.    When placed in the stream of commerce, PPIs contained unreasonably dangerous design defects and was not reasonably safe and fit for their intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the product, including Plaintiffs, to risks which exceeded the benefits of the product;

b.    The product did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended or reasonably foreseeable way;

c.    The product was insufficiently tested;

d.    The product caused harmful side effects that outweighed any potential utility;

e.    The product was more dangerous than other PPI's on the market; and

      f.      The product was not accompanied by adequate labeling or instructions for use to fully apprise the public and consumers, including Plaintiffs, of the potential risks and serious side effects associated with their use.

362.     In light of the potential and actual risk of harm associated with the products' uses, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PPIs should not have been marketed in that condition.

363.     There existed safer alternative designs, but Defendants chose to market a more dangerous design.

364.     At all times relevant herein, Defendants knew that PPIs would be prescribed by doctors to members of the general public who would rely upon the representations made by Defendants on the product label and in their marketing including public statements and promotional and sales materials.

365.     At all times material to this action, PPIs was expected to reach, and did reach, consumers in the State of California and throughout the United States, including Plaintiffs, without substantial change in the condition in which it was sold.

366.     Defendants knew or should have known of the defective nature of PPIs but continued to research, develop, design, test, manufacture, package, formulate, inspect, label, distribute, market, promote, sell and otherwise release these products into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their products.

367.     At all times, Plaintiffs used PPIs for their intended or reasonably foreseeable purpose.

368.    As a direct and proximate result of the defective and unreasonably dangerous condition of PPIs and of their failure to perform safely, Plaintiffs suffered injuries as set forth above.

## COUNT IV

## CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY – DESIGN DEFECT

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

369.    At all times material to this action, Defendants were responsible for designing, developing, researching, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, the PPIs, which are defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiffs.

370.    At all times material to this action, PPIs were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.    it  contained warnings insufficient to alert consumers, including Plaintiffs herein, of the dangerous risks and injuries associated with PPIs, and the comparative severity, duration and the extent of the risks and injuries;

b.    it contained warnings insufficient to alert consumers, including Plaintiffs herein, of the propensity to cause a substantial increased risk of serious bodily harm.

c.    The warnings that were given by the Defendants were not detailed, clear, and/or were ambiguous.

371.    Plaintiffs could not have discovered any defect in PPIs through the exercise of reasonable care.

372.    Defendants, as manufacturers, sellers and/or distributors of PPIs, are held to the level of knowledge of an expert in the field.

373.    Plaintiffs and Plaintiffs' doctor reasonably relied on the skill, superior knowledge, and judgment of Defendants.

374.    Defendants had a continuing duty to warn the Plaintiffs of the dangers associated with the use of PPIs.

375.    Plaintiffs consumed and used PPIs for their intended purpose.

376.    Had Plaintiffs and Plaintiffs' doctor received adequate warnings regarding the risks of PPIs, Plaintiffs would not have used it.

377.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of PPIs, Plaintiffs suffered injuries as set forth above.

## COUNT V

## <u>CAUSE OF ACTION FOR MISREPRESENTATION</u>

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

378.    Defendants individually and collectively represented that PPIs were safe when used for their intended purposes, and further, by omission, Defendants represented that the PPI Products did not cause an increased risk of serious kidney injuries, including AIN, AKI, CKD, and ESRD or renal failure, as well as life-threatening complications thereof and even death.

379.    Each of those representations by Defendants was false because PPIs, in fact, were and are not safe when used for their intended purposes, and furthermore, the PPI products did and

do in fact cause an increased risk of serious kidney injuries, including AIN, AKI, CKD, and ESRD or renal failure, as well as life-threatening complications thereof and even death.

380.    Defendants knew, should have known, and/or could have known that the PPI Products were not safe when used for their intended purposes for numerous reasons, including but not limited to the following:

a.    they received adverse event reports of serious kidney injuries during the conduct of premarketing clinical trials of the PPI Products;

b.    the potential for PPIs to cause these types of injuries was reported in peer-reviewed medical and scientific publications starting as early as 1992;

c.    they had in their exclusive possession and control information and data indicating that a safety signal regarding the risk of serious kidney injuries; and

d.    they derived substantial profits from sales of the PPI Products, which at times were as high as several billion dollars per year per PPI Product, giving Defendants ample resources to conduct high powered postmarketing clinical trials that would have detected the increased risk of serious kidney injuries and enabled them to make a determination as to causality.

381.    Therefore, when Defendants made these misrepresentations as to the safety of the PPI Products and their tendency not to cause serious kidney injuries, Defendants either knew they were false or represented these facts as of their knowledge with reckless disregard to whether they were true or false.

382.    These misrepresented facts concern the character and/or the quality of the PPI Products, namely their safety and their tendency not to cause serious kidney injuries, including AIN, AKI, CKD, and ESRD or renal failure, as well as life-threatening complications thereof and even death.

383.    Defendants' affirmative misrepresentations and misrepresentations by omission were material because, upon information and belief, absent these misrepresentations and/or had consumers including Plaintiffs and the medical community including Plaintiffs' prescribing physicians been informed of the true nature, quality and character of the PPI Products, Plaintiffs' prescribing physician would not have prescribed Plaintiffs the PPI Products and Plaintiffs would not have used the PPI Products

384.    Defendants, either personally or through their corporations, businesses, subsidiaries, divisions, subdivisions, affiliates, partners, joint-venturers, predecessors, officers, directors, employees, representatives, independent contractors, and/or other agents,  made the foregoing misrepresentations to the public, including Plaintiffs, through the use of various means, avenues and types of advertising, including without limitation:

        a.      in-print marketing, advertising and promotional materials;

        b.      on Defendant owned, controlled or supported websites and blogs;

        c.      in materials and advertisements to consumers, including Plaintiffs, stating that the use of PPI Products is safe; and

        d.      through sales persons and representatives who promoted the PPI Products to doctors, clinics and users.

385.    Defendants    intended    for    their    affirmative    misrepresentations    and misrepresentations by omission about the nature, quality and character of the PPI Products to reach, and upon information and belief they did reach, consumers, including Plaintiffs, and the medical community, including Plaintiffs' prescribing physicians.

386.    Upon information and belief, when Plaintiffs' prescribing physicians decided to prescribe the PPI Products to Plaintiffs, Plaintiffs' prescribing physicians relied upon Defendants' expertise, skill, judgment and knowledge, and as a result, Plaintiffs' prescribing physicians relied

upon Defendants' affirmative misrepresentations and misrepresentations by omission.  Upon information and belief, when Plaintiffs decided to use the PPI Products, Plaintiffs relied upon Defendants' expertise, skill, judgment and knowledge, and as a result, Plaintiffs relied upon Defendants' affirmative misrepresentations and misrepresentations by omission.

387.    As a result of having relied upon Defendants affirmative misrepresentations and misrepresentations by omission, Plaintiffs' prescribing physician did prescribe the PPI Products to Plaintiffs, and Plaintiffs did use and/or ingest the PPI Products.

388.    As a direct and proximate result of Plaintiffs', and Plaintiffs' prescribing physicians', reliance on Defendants' affirmative misrepresentations and misrepresentations by omission, Plaintiffs were caused to suffer physical harm.  As a direct and proximate result of Plaintiffs', and Plaintiffs' prescribing physicians', reliance on Defendants' affirmative misrepresentations and misrepresentations by omission, Plaintiffs were caused to suffer physical, psychological and emotional injuries, which are permanent as lasting in nature, as well as the resulting damages alleged herein.

389.    Plaintiffs' and Plaintiffs' prescribing physicians' reliance upon Defendants' affirmative misrepresentations and misrepresentations by omission was justifiable on for many reasons, including but not limited to the following:

a.    Defendants possess expertise, skill, judgment and knowledge of experts in the field of pharmaceuticals;

b.    Defendants, at all times relevant and material hereto, were under a duty to disclose the true nature, quality, and character of the PPI Products because this was nonpublic information over which Defendants had and continue to have exclusive possession and control;

c.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks;

d.    Defendants conducted extensive clinical trials and studies on the safety of the PPI Products, which could have, and should have, revealed the existence of the increased risk of serious kidney injuries, including that suffered by Plaintiff;

e.    Plaintiffs and Plaintiffs' prescribing physicians lacked the resources that are and were available to Defendants at all times relevant and material hereto, which enabled Defendants alone to determine the true nature, extent and identity of any health risks or safety issues related to the PPI Products, and Plaintiffs and Plaintiffs' prescribing physicians were therefore forced to rely upon Defendants' representation;

f.    Defendants were and continue to be in possession of information and data that shows the risk and dangers of the PPI Products that is not otherwise in the possession of or available to the FDA, the public, the medical community, Plaintiffs' prescribing physicians, and/or Plaintiffs; and

g.    When Plaintiffs' prescribing physicians decided to prescribe the PPI Products to Plaintiffs, when Plaintiffs decided to use the PPI Products as prescribed, and when Plaintiffs were injured, no person or entity other than Defendants possessed or was aware of any fact, information or data suggesting or otherwise indicating either that the PPI Products could cause serious kidney injuries or that Defendants' representations should not be trusted, and no person or entity other than Defendants' possessed or was aware of any fact, information or data that would have made a reasonably prudent person suspicious of Defendants wrongdoing.

390.    Plaintiffs' justifiable, reasonable and objective belief at the time of use and at the time of injury, therefore, was that the PPI Products were safe and fit for their intended use, and that the PPI Products did not cause an increased risk of serious kidney injuries, including AIN, AKI, CKD, and ESRD or renal failure, as well as life-threatening complications thereof and even death.

391.    Defendants therefore misrepresented to the public, including consumers such as Plaintiffs, material facts concerning the character and quality of the PPI Products, which Plaintiffs justifiably relied upon, thereby directly and proximately resulting in the physical harm to Plaintiffs alleged herein.

392.    The actions, inactions, misstatements, and omissions of Defendants as alleged herein were committed maliciously, oppressively, fraudulently, and their conduct was despicable with a willful and conscious disregard of the rights and safety of others, thereby warranting the imposition of punitive damages.

## COUNT VI

## CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTY

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

393.    At all times material to this action, Defendants were responsible for designing, developing, researching, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, the PPIs, which are defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiffs.

394.    At the time of making these warranties, Defendants knew or should have known that, in fact, the representations and warranties were false, misleading, and untrue in that PPIs were not safe, effective and fit for use by consumers and users, including Plaintiffs, for their intended

use, that it was not of merchantable quality, that it did produce dangerous side effects, serious health conditions and that it was not adequately tested or fit for their intended purpose.

395.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in using PPIs.

396.    Plaintiffs used PPIs for their intended purpose.

397.    Defendants breached said implied warranties, in that, PPIs were not safe, effective and fit for their intended purpose, was not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when taken in their recommended dose, and other injuries as herein alleged.

398.    Due to Defendants wrongful conduct as alleged herein, Plaintiffs could not have known about the nature of the risks and side effects associated with PPIs until after they used it.

399.    As a direct and proximate result of the Defendants breach of implied warranties and the unreasonably dangerous and defective characteristics of PPIs, Plaintiffs suffered injuries as set forth above.

## COUNT VII

## CAUSE OF ACTION FOR WRONGFUL DEATH

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

400.    Plaintiffs bring this claim on behalf of the Estate and for the benefit of each Plaintiff-Decedent's lawful beneficiaries pursuant to California Code of Civil Procedure § 377.60.

401.    Plaintiff-Decedents left heirs, who are successors-in-interest to the Plaintiff-Decedents and who are entitled to take under applicable state law.  By reason of the Plaintiff-Decedents' deaths, these heirs have suffered, and been permanently damaged by, a pecuniary and/or non-pecuniary loss, including but not limited to the following:

a.      sorrow, mental anguish, and solace, including society companionship, comfort, guidance kindly offices and advice of Plaintiff-Decedents;

b.      loss of support and services;

c.      loss of the income of Plaintiff-Decedents' income, services, protection, care and assistance;

d.      expenses for the care, treatment and hospitalization of Plaintiff-Decedents incident to their injuries resulting in their deaths; and

e.      funeral expenses.

402.    As a direct and proximate result of the wrongful conduct of Defendants as set forth herein, and the defective nature of PPIs as described herein, each Plaintiff-Decedent suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

403.    As a direct and proximate cause of the conduct of Defendants, Plaintiff-Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Plaintiff-Decedents' deaths.  Plaintiff brings this claim on behalf of Plaintiff-Decedents' lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries pursuant to California law.

404.    As a direct and proximate consequence of the negligence, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts that gave rise to this action for wrongful death, Plaintiffs sustained permanent and lasting physical, psychological and emotional injuries and damages which are permanent and lasting in nature, and the resulting damages alleged herein.

**COUNT VIII**

## CAUSE OF ACTION FOR LOSS OF CONSORTIUM

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

405.    Each Plaintiff-Spouse is and was the lawfully wedded spouse of a Plaintiff in this action, and as such, the Plaintiff-Spouses were and are entitled to the comfort, enjoyment, society and services of their spouse.

406.    As a direct and proximate result of the forgoing, each Plaintiff-Spouse

      a.    was deprived of the comfort and enjoyment of the services and society of his or her spouse, Plaintiff;

      b.    has suffered and will continue to suffer economic loss; and

      c.    has been otherwise emotionally and economically injured.

407.    The Plaintiff-Spouses' injuries and damages are permanent and will continue into the future.  Accordingly, the Plaintiff-Spouses seek actual and punitive damages from Defendants as alleged herein.

## COUNT IX

## CAUSE OF ACTION FOR SURVIVAL ACTION

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

408.    Plaintiffs, the successors-in-interest to Plaintiff-Decedents, bring this claim on behalf of the Estates of Plaintiff-Decedents' for damages pursuant to California Code of Civil Procedure § 337.30.

409.    As a direct and proximate result of the conduct of Defendants, Plaintiff-Decedents, prior to their deaths, were obligated to spend carious sums of money to treat their injuries, which debts have been assumed by the Estate.  As a direct and proximate result, Plaintiff-Decedents were

caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the dates of their deaths; and as a direct and proximate result of the aforesaid, Plaintiff-Decedents suffered a loss of earnings and earning capacity.

410.    Plaintiffs bring this claim on the behalves of the Estates of Plaintiff-Decedents. As a direct and proximate result of the conduct of Defendants, Plaintiff-Decedents and their spouses, heirs, and next-of-kin as applicable until and after the time of Plaintiff-Decedents' deaths, suffered a disintegration and deterioration of their family units and the relationships existing therein, resulting in enhanced anguish, other symptoms of psychological stress, disorder, and emotional distress and mental anguish generally. As a direct and proximate result of the conduct of Defendants, and including the observances of the suffering of Plaintiff-Decedents, until the dates of their deaths, Plaintiff-Decedents suffered permanent and ongoing damages.

411.    Plaintiff-Decedents left, as applicable, surviving heirs, next-of-kin and/or distributes who were and are entitled to take under the law deemed to apply and who, by reason of Plaintiff-Decedent's death, have suffered a pecuniary and/or non-pecuniary loss, including but not limited to the Plaintiff-Decedent's support, income, services and guidance, and such individuals have suffered pecuniary and non-pecuniary injuries, and all were thereby permanently damaged.

412.    As a direct and proximate result of the foregoing, and including the observance of the suffering and physical deterioration of Plaintiff-Decedents until the dates of their deaths. Plaintiff-Decedents' spouses, heirs, and/or next-of-kin, as applicable, as Administrators or beneficiaries of the Estates of Plaintiff-Decedents, bring this claim on the behalves of the Plaintiff-Decedent's Estates for damages under California law.

413.    As a direct and proximate consequence of the negligence, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts that gave rise to this action for wrongful death, Plaintiffs sustained permanent and lasting physical, psychological and

emotional injuries and damages which are permanent and lasting in nature, and the resulting damages alleged herein.

414.    The actions, inactions, misstatements, and omissions of Defendants as alleged herein were committed maliciously, oppressively, fraudulently, and their conduct was despicable with a willful and conscious disregard of the rights and safety of others, thereby warranting the imposition of punitive damages.

## VIII.    PUNITIVE DAMAGES ALLEGATIONS

Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint as if fully set forth at length here, and further allege as follows:

415.    Beginning with PPIs, Defendants engaged in a course of conduct that included selling untested or inadequately tested products, misrepresenting the safety and efficacy of those products, continuing to market products despite known safety concerns raised by federal agencies and otherwise engaging in a course of conduct that is reprehensible. That conduct continued with the marketing of PPIs.

416.    At all times material hereto, Defendants knew that the use of PPIs could result in the development of serious harm and death. Additionally, Defendants knew that the use of PPIs would cause users, including Plaintiffs, to suffer serious injury.

417.    At all times material hereto, Defendants engaged in conduct that constitutes malice, oppression or fraud, including without limitation the misrepresentations, warranties and omissions set forth above.

418.    Defendants continued to market PPIs to consumers, including Plaintiffs, without disclosing the fact that use of PPIs could result in the development of serious injuries. Defendants did so knowing that their failure to reveal the probable consequences of ingesting PPIs would

seriously injure consumers, including Plaintiffs, in order to make a profit and in so doing they acted with malice.

419.    Defendants went further than failing to warn of PPIs' defective and dangerous nature. They intentionally and falsely represented and warranted that PPIs were safe when they knew that, in fact, PPIs were unsafe and posed a serious risk of injury to consumers, including Plaintiffs. They further concealed the true risks of PPIs as alleged herein. In so doing, they acted with fraud.

420.    Defendants continued to sell PPIs despite knowing the serious risk of injury posed to consumers. Such conduct is despicable and oppressive.

421.    Defendants' acts of malice, oppression and fraud were on the part of corporate officers, directors or managing agents, or were on the part of employees and were ratified or authorized by Defendants.

422.    Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of PPIs against the benefits in making their decision to use PPIs.

423.    As a direct and proximate result of the Defendants conscious and deliberate disregard for the rights and safety of consumers, Plaintiffs suffered severe injury and loss. Plaintiffs likewise suffered loss as alleged herein. Plaintiffs seek actual and punitive damages from Defendants as alleged herein.

424.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

## **GLOBAL PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays for judgment as follows:

a.    As to all Counts and all Defendants, damages to the Plaintiffs according to proof including as applicable:

i.    Past and future medical and care expenses of Plaintiffs according to proof;

ii.    Past and future loss of earnings (and profits) of Plaintiffs according to proof;

iii.    Other economic loss;

b.    As to all Counts and all Defendants, Non-economic damages according to proof including as applicable:

i.    Compensation for physical pain and discomfort;

ii.    Compensation for fright, nervousness, anxiety, worry, and apprehension;

c.    As to all Counts and all Defendants, awarding pre-judgment and post-judgment interest to the Plaintiffs according to proof;

d.    As to all Counts and all Defendants, awarding reasonable costs to the Plaintiffs as provided by law;

e.    As to all Counts and all Defendants, awarding Plaintiffs punitive and treble damages; and

f.    As to all Counts and all Defendants, granting all such other relief as the Court deems necessary, just and proper.

Date: April 12, 2018

/s/ Melinda D. Nokes
Melinda D. Nokes (CA Bar #167787)
Paul J. Pennock, Esq.
**WEITZ & LUXENBERG, P.C.**
1800 Century Park East, #700
Los Angeles, CA 90067
Phone: (310) 247-0921
Facsimile: (310) 786-9927
mnokes@weitzlux.com

ppennock@weitzlux.com

*Counsel for Plaintiffs*